UNITED STATES of America,
Plaintiff–Appellee,

v.

Gary P. TAYLOR, Sr., Catherine A. Demski and Harley S. Pryne, Defendants–Appellants.

Nos. 94–4003, 95–1039 & 95–1093.

United States Court of Appeals, Seventh Circuit.

Argued May 17, 1995.

Decided Dec. 20, 1995.

Timothy O'Shea (argued), Office of U.S. Attorney, Madison, WI, for U.S.

Robert A. Christensen (argued), Christensen & Kenney, Madison, WI, for Gary P. Taylor, Sr.

Nancy Wettersten, Julian, Musial, Wettersten & Friedrich, Madison, WI, for Catherine A. Demski.

John A. Chavez, Robert A. Christensen (argued), Cambridge, WI, for Harley S. Pryne.

Before POSNER, Chief Judge, COFFEY and ROVNER, Circuit Judges.

COFFEY, Circuit Judge.

Catherine A. Demski, Gary P. Taylor, Sr. and Harley Pryne appeal their respective sentences, which stem from participation in a drug distribution conspiracy based in western Wisconsin between Spring of 1992 and mid-February of 1993. Five of the key players in this conspiracy, including the appellants, were indicted by a federal grand jury on June 22, 1994 and charged in Count I of the indictment with having conspired to distribute cocaine between July 1, 1991 and February 13, 1993, in violation of 21 U.S.C. § 841(a) and 21 U.S.C. § 846. Count II charged all of the defendants except Demski with conspiring to distribute marijuana during the same time period. Count III charged Charles Taylor, Jason Craig, and Pryne with possession with intent to distribute cocaine on September 30, 1992, in violation of 21 U.S.C. § 841(a)(1). The fourth count of the indictment charged Charles and Gary Taylor and Pryne with possession with intent to distribute cocaine on or about February 12–13, 1993, in violation of 21 U.S.C. § 841(a)(1).

The appellants entered into written plea agreements in late September 1994. Gary Taylor, Sr. and Pryne agreed to plead guilty

to Count IV of the indictment. Demski agreed to waive prosecution and plead guilty to a one-count information charging her with an attempt to possess cocaine with intent to distribute on or about February 12–13, 1993, in violation of 21 U.S.C. § 846. The district court accepted these pleas and sentenced the defendants on December 14, 1994. Demski was sentenced to 150 months imprisonment, to be followed by five years of supervised release, and ordered to pay a criminal assessment penalty of $50, plus $198 in restitution to the Wisconsin Crime Laboratory. Gary Taylor, Sr. and Pryne were each sentenced to a prison term of 87 months, to be followed by five years of supervised release, and ordered to pay a criminal assessment penalty of $50, plus $198 in restitution to the Wisconsin Crime Laboratory.

Demski, Pryne, and Gary Taylor, Sr. appeal their sentences, arguing: (1) that the district court incorrectly determined the quantities of cocaine attributable to them for sentencing purposes, and (2) that Catherine Demski was improperly denied a three-point reduction in her offense level for acceptance of responsibility. We AFFIRM.

## BACKGROUND [1]

### Overview of Conspiracy

In the Summer of 1991, 28–year old Catherine Demski was living in Wisconsin Rapids, Wisconsin, where she operated a business called "Metro Liquidators" and cared for her infant son. Charles Taylor [2] moved to Wisconsin Rapids that summer and established a drywall business known as "Taylor Drywall." Charles met Demski during the summer, and he moved into her apartment above Metro Liquidators.

By the Fall, Charles Taylor was using cocaine recreationally. He began to sell marijuana and cocaine the next Spring, and shortly thereafter established a drug distribution network that included Demski and himself, at least half a dozen runners or couriers, and a drug source in Zion, Illinois, as well as numerous customers in the Wisconsin Rapids area. Antonio Guerrero, who lived in Zion, Illinois, supplied the drugs through Charles' brother, the appellant Gary Taylor, Sr., who also lived in Zion. Occasionally, Demski and Charles would drive to Zion to pick up the cocaine, and at times Gary would transport the drug shipments to Wisconsin. By and large, however, Charles employed runners or couriers (including the appellant Harley Pryne) to transport the drugs from Illinois to Wisconsin. The runners would often transport cars, children, or tools back and forth between the two states as a cover for the drug operation. When the runners returned to Wisconsin Rapids with cocaine, Demski and Charles would retain some of the drug for their own use and "cut" the remainder with Inositol.[3] Thereafter, they would weigh and package the cut cocaine for distribution to their customers. Demski kept records documenting how much cocaine had been "fronted" (supplied to customers on credit) and how much money each customer owed.

### Customer Ray Ninneman:

### Spring 1992—December 1992

Ray Ninneman was one of the individuals to whom Charles sold drugs. Ninneman informed police detectives that he regularly obtained drugs from Charles Taylor between the Spring of 1992 and December of 1992. Ninneman related that he would usually pick up the cocaine at the Taylor–Demski apart-

---

1. The extensive factual background contained herein sets forth both the extent and the duration of the defendants' drug distribution conspiracy. This information is provided in order that we might address the sentencing issues raised in this appeal. The appellants challenge the amounts of cocaine attributed to each of them for sentencing purposes. Demski maintains that she accepted responsibility for her conduct, even though her account directly contradicted the findings of the district court by minimizing the extent of the conspiracy's drug trafficking.

2. Charles Taylor is the brother of the appellant Gary Taylor, Sr. Gary appealed, Charles did not.

3. Inositol is a white, powdery vitamin compound commonly used as a cutting agent for cocaine. The frequent practice of diluting or "cutting" cocaine increases the drug's volume and profitability, while at the same time decreasing its potency.

ment, where he observed Demski weighing and packaging cocaine while also "keeping an eye on the cash flow." According to Ninneman, Charles Taylor was orchestrating two or three trips to Illinois per week during the time frame between Spring 1992 and December 1992, and obtaining between two and eight ounces of cocaine on each trip.

### Customer and Distributor Chad Kuehl:

#### April 1992—December 1992

Chad Kuehl, who began purchasing marijuana from Charles Taylor in April of 1992 and later bought cocaine from him, eventually became a trusted associate of Taylor. Kuehl told investigators that in the early Fall of 1992, a member of the conspiracy travelled to Illinois roughly every three days. Later in the Fall, according to Kuehl, the trips often occurred daily and involved between two and eight ounces of cocaine. At one time, Charles Taylor told Kuehl that he was getting $10,000 worth of cocaine a week. Kuehl stated that he and Charles Taylor "figured it out one day" and calculated that the conspiracy had distributed twenty pounds of cocaine and one hundred pounds of marijuana between July and December of 1992.

### Courier William Nelson:

#### May 1992—September 1992

William Nelson, Charles Taylor's first drug courier, travelled to Zion, Illinois during the Spring, Summer, and early Fall of 1992 to pick up cocaine and marijuana from Charles' brother, Gary Taylor, Sr. Nelson's live-in girlfriend, Marilyn Draxler, was interviewed by Government investigators following the indictments in this case and recalled that Nelson began running drugs for Charles Taylor in May or June of 1992. Nelson himself gave varying accounts of his role in the conspiracy. He testified before the grand jury that he made drug runs once or twice a week "basically all summer, right up until a little bit before deer hunting [season]" (November) and that he picked up five or six ounces of cocaine per trip. More recently, when interviewed by a probation officer, Nelson recalled smaller amounts of cocaine

(three to four ounces) and less frequent trips (generally once a week).

### Courier Jason Craig:

#### Summer 1992—Fall 1992

In the Summer of 1992, Charles Taylor persuaded Jason Craig (whom he had met in Illinois) to move to Wisconsin Rapids, promising him a job in his drywall business and a place to stay. Craig recalled for the grand jury and the author of the Presentence Investigation Report ("PSR") that he moved in with Charles Taylor and Catherine Demski just before the Fourth of July 1992. According to the PSR:

> Craig learned immediately that Charles Taylor used cocaine because he would do so on the job sites. He immediately learned that Charles Taylor sold marijuana, and in about July he learned that Charles Taylor also sold cocaine. By the end of July, Craig had seen Charles Taylor with ... cocaine ... and observed [him] weighing cocaine on a triple beam scale.

Craig recalled that he began to run drugs for Charles Taylor during mid or late August. On the first of these expeditions, Charles Taylor gave Craig an envelope to deliver to his brother Gary Taylor, Sr. Craig went to Zion and delivered the envelope, receiving in exchange a package approximately 6″ × 8½″. Upon returning to Wisconsin Rapids, Craig gave the package to Charles Taylor, who opened it in Craig's presence, revealing cocaine. Craig then observed Taylor cut the cocaine and weigh it for distribution.

Craig recalled making about seven additional trips to Illinois from late August through the Fall. Craig stated that on four or five of these forays, he was accompanied by the appellant Pryne. Craig stated that he always picked up drugs from Gary Taylor, Sr. and that the usual amount of cocaine for each pick-up was four ounces.

### Courier Harley Pryne:

#### August 1992—February 1993

The appellant Harley Pryne joined the conspiracy in late August or early September

and was soon pressed into service as a courier or runner transporting drugs between Zion and Wisconsin Rapids. Charles, who was selling cocaine to Pryne for his personal use, took advantage of Pryne's addiction and his indebtedness to enlist his help.[4]

Pryne recalled making about seven trips to Illinois between October 1992 and February 13, 1993, often with Craig. Pryne estimated the usual amount of each pick-up at three ounces (less than the amount estimated by Craig).[5] On December 15, Pryne was injured in a car accident and entered a drug treatment program, temporarily interrupting his participation in the conspiracy. After his release from drug therapy on January 20, 1993, however, Pryne resumed his cocaine habit vis-a-vis Charles Taylor and took part in a run to Illinois on February 12–13, 1993, which led to his arrest.

### The Trip to Arizona: September 1992

In late September, Charles Taylor, Jason Craig, Harley Pryne, William Nelson, and an individual named Randy Popp drove to Arizona, where they obtained somewhere between five and twelve ounces of cocaine and approximately two pounds of marijuana. They returned to Wisconsin within a few days.

### Search of Taylor–Demski Apartment:

### December 1992

On December 6, pursuant to a search warrant, police searched the apartment shared by Charles Taylor and Catherine Demski. While they found only small amounts of cocaine and marijuana, they discovered drug paraphernalia (scales, sifters, Inositol, a drug ledger) suggesting that Taylor and Demski (the sole occupants of the apartment as far as the record reveals) were engaged in the business of processing and distributing drugs. Taylor was arrested.[6]

On the same day, the police executed a search warrant at the home of Chad Kuehl, where they discovered similar drug paraphernalia. Kuehl was arrested for possession of drug paraphernalia and for earlier sales of controlled substances to an undercover officer. He told police that Charles Taylor had been his source for these transactions. Kuehl also informed the police that he had recently observed Charles Taylor counting out $16,000 in cash in preparation for a trip on which Taylor himself would go to Illinois and pick up eight ounces of cocaine. Finally, Kuehl related that he had observed Charles Taylor with between six and eight ounces on the evening of December 5.

### Cocaine Sale to Detective Jackie Albers: February 1993

In February of 1993, local law enforcement officers successfully infiltrated the drug distribution conspiracy spearheaded by Charles Taylor and obtained valuable information about its operations. Stacey Lecas, who had purchased cocaine from Jason Craig since October of 1992, began cooperating with the Government as of February of 1993.[7] On February 10, Lecas contacted Charles Taylor to arrange for a purchase of cocaine by her friend "Allie." Unbeknownst to Charles Taylor, "Allie" was Detective Jackie Albers, an undercover officer working for the Marshfield, Wisconsin police department. When Lecas phoned Catherine Demski, trying to find Charles, Demski informed her that Charles was arguing with the source over price and asked if she was interested in going to Illinois to pick up the drugs herself. When Lecas replied that she was not interested, Demski suggested sending Harley Pryne for the drugs, stating: "We send Harley all the time. We give him four or five

---

4. Charles Taylor compensated Pryne for his drug-running activity by selling him cocaine at a discount.

5. These estimates, apparently given to the author of the PSR, are lower than those Pryne gave to an undercover police detective during the "sting" operation that led to his arrest in February 1993 (discussed *infra*).

6. It appears that Charles was released from custody soon after his arrest, although the record lacks detail concerning precisely what happened following the search of the Demski–Taylor apartment.

7. The record does not reflect how Lecas came to be a Government informant.

grand, six grand, it doesn't matter 'cause he's good for it, and so what we want to do is see who wants to come up with something and then we just give him the money and then he takes off and he's good for it." Lecas remained dubious. Charles Taylor finally agreed to let Allie accompany Pryne on his trip to Illinois on February 12, 1993. In addition to Allie's cocaine, Pryne was scheduled to pick up an ounce of cocaine for another customer, Tom Arnold, who had already paid Demski $1,600 for the ounce.

On February 12, Charles Taylor and Detective Albers drove to a gas station near Wisconsin Rapids to rendezvous with Pryne. On the way, Charles informed "Allie" that he made his money selling cocaine and that his business, Taylor Drywall, was a cover for his drug trafficking activity. When Charles Taylor and Detective Albers arrived at the gas station, Charles gave Pryne a large amount of cash, Pryne got into "Allie's" car, and the two drove to Zion.

During the trip, Pryne revealed that he had joined Charles Taylor's drug distribution operation during the Summer of 1992, that one of the conspirators went to Illinois to pick up cocaine at least twice a month (but sometimes as often as two or three times per week), and that the usual amount of cocaine transported on each trip was eight ounces.

When Pryne and Albers arrived at Gary Taylor, Sr.'s house in Zion, Pryne delivered the cash to Gary, who told Albers that he would return shortly with her "tools." After some time, Gary returned and directed Pryne to a car parked some distance from his house, where two plastic baggies of cocaine were buried in the snow next to the rear tires.

That night, on the return trip to Wisconsin with Detective Albers, Pryne divulged further details about the Taylor conspiracy. He repeated that the organization sent a runner to Illinois at least twice a month and that the usual amount of cocaine transported was eight ounces. On this occasion, Pryne admitted that a runner went to Illinois as frequently as every few days and that the pick-ups at times involved an additional three to five ounces of cocaine. Pryne told Albers that in the wake of the December search by the police, Charles Taylor no longer stored cocaine at the apartment he shared with Demski. Rather, he stored the drugs at his house in Wisconsin Rapids, or at the residences of Pryne, Craig, or an individual named Nathan Trask. Pryne added that "Charlie takes care of everybody" by supplying plenty of "cola" (cocaine).

At the conclusion of this trip, early in the morning of February 13, Pryne and Albers returned to the gas station near Wisconsin Rapids where they had met earlier. Charles Taylor was waiting and soon engaged them in conversation. At this juncture, a surveillance team positioned in the parking lot moved in and arrested Charles Taylor and Harley Pryne.

### Guilty Pleas and the Pre-Sentencing Process

As noted above, a federal grand jury indicted Charles Taylor, Catherine Demski, Gary Taylor, Sr., Harley Pryne and Jason Craig, charging them with violations of 21 U.S.C. §§ 841(a) and 846. Gary Taylor, Sr. and Harley Pryne pleaded guilty to Count IV of the indictment, charging that on February 12–13, 1993, they had possessed cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Demski pleaded guilty to a one-count information charging her with attempting to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 846.

Following the guilty pleas, the probation office began to prepare PSRs for the appellants. In a letter dated November 15, 1994, the Government wrote to probation officer Leslyn Spinelli, stating its view that the conspiracy had distributed "well in excess of five kilograms of cocaine," *excluding* the cocaine brought back from Arizona and the cocaine found in the possession of Charles Taylor and Pryne on February 13, 1993. Specifically, the Government calculated that the conspiracy had trafficked in a total of 7.27 kilograms between May 1, 1992 and December 31, 1992. According to the Government, this estimate was abundantly supported by mutually-corroborating statements from Ray Ninneman, Chad Kuehl, Harley Pryne, Charles Taylor, and Catherine Demski.

The probation officer reached a more conservative estimate, concluding that the Taylor conspiracy made, on average, six trips each month and picked up an average amount of four ounces per trip. This amounted to twenty four ounces each month, which, when multiplied by nine months, yielded a total of 6.435 kilograms of cocaine. Catherine Demski filed detailed written objections to the PSR, including a paragraph-by-paragraph analysis of the PSR and a written statement giving her own narrative of the conspiracy.

### Sentencing

The district court conducted its sentencing hearing on December 14, 1994. Although neither the Government nor the defendants chose to call witnesses or introduce physical evidence at the hearing, the court reviewed the detailed PSR prepared by the probation department as well as the government's account of the Taylor conspiracy. Additionally, the court gave each of the defendants an opportunity to comment, directly and through counsel, concerning the accuracy of the PSR. As discussed in detail below, counsel for Demski, expanding on written objections filed with the court, challenged the factual conclusions of the PSR with respect to both the duration of the conspiracy and the amounts of cocaine in which it trafficked. Counsel for Gary Taylor, Sr. adopted Demski's account of events but noted that his client was "calendar illiterate"[8] and therefore unable to make a meaningful assessment of when the conspiracy began and ended. Pryne's counsel accepted the probation officer's calculations regarding the amounts of cocaine distributed by the conspiracy, but argued that his client had been involved in the conspiracy for a shorter period of time than outlined in the PSR and was therefore responsible for smaller amounts of cocaine. Ultimately, after considering the PSR and

the defendants' objections thereto, the court adopted the findings of the probation department,[9] concluding that (1) the conspiracy distributed, on average, 24 ounces of cocaine per month, (2) the conspiracy began in the Spring of 1992 and lasted until February 13, 1993, and (3) Demski had not accepted responsibility for relevant conduct and was therefore not entitled to a reduction of 3 points in her base offense level.

Because Demski's offense and relevant conduct encompassed between 5 and 15 kilograms of cocaine, the district court calculated a base offense level of 32.[10] Demski had a category II criminal history, largely because of past drunk driving violations in Wisconsin. The court sentenced her to 150 months, a term of imprisonment falling in the middle of the range prescribed by the Guidelines (135–168 months).

Again using the amounts of cocaine calculated by the probation office (between 5 and 15 kilograms), the district court determined that Gary Taylor, Sr.'s base offense level was 32. Taylor, unlike Demski, was granted a reduction of 3 points for acceptance of responsibility pursuant to §§ 3E1.1(a) and (b) of the Guidelines. This gave him an adjusted offense level of 29, which, combined with a category I criminal history, allowed the court to sentence him to between 87 and 108 months imprisonment. The court imposed a sentence of 87 months, partly in consideration of the fact that Gary Taylor, Sr. had been "influenced and perhaps manipulated by [his] brother and got into something that [he] didn't really understand or really appreciate."

The court determined that Pryne had a base offense level of 28 (based on the smaller quantity of cocaine attributable to him) and was entitled to a reduction of 3 points for acceptance of responsibility pursuant to

---

**8.** Apparently Taylor suffered an inability to analyze the chronology of events using recognizable and sequential dates.

**9.** The court did not adopt the probation officer's recommendation that Demski receive an enhancement of her base offense level, pursuant to U.S.S.G. § 3B1.1, for acting as a manager or supervisor of the criminal activity.

**10.** The probation department (and later the district court) largely ignored the quantities of marijuana in which the Taylor conspiracy trafficked. As the government explains in its brief, "[t]he sentences were driven by the weight of the cocaine. This is so because no defendant was close enough to the top of any drug quantity range for the marijuana to have made a difference."

§§ 3E1.1(a) and (b). For a defendant with an adjusted offense level of 25, the Guidelines authorize a range of imprisonment from 70 to 87 months. The district court sentenced Pryne to the high end of this range (87 months), observing that Pryne had been "involved in a major amount of cocaine dealing" and that he had "a fairly extensive criminal history."

## ISSUES

This appeal addresses two issues: (1) whether the district court committed clear error when it determined the quantities of cocaine attributable to each of the appellants for sentencing purposes, and (2) whether the district court committed clear error when it found that Catherine Demski was not entitled to a three-point reduction in her offense level for acceptance of responsibility.

## DISCUSSION

### I. Quantities of Cocaine Attributable to Defendants

Catherine Demski appeals the district court's determination, pursuant to the relevant conduct provisions of the Sentencing Guidelines, U.S.S.G. § 1B1.3, that she was responsible for a total of between 5 and 15 kilograms of cocaine. Demski objects to the court's reliance on the drug quantity estimates prepared by the probation office. Appellants Pryne and Gary Taylor, Sr. have adopted Demski's arguments and are also claiming that the district court erroneously calculated the amounts of cocaine attributable to them for sentencing purposes.

The appellants, through Demski, make three closely-related arguments with respect to the court's findings. First, they allege that the district court improperly relied upon the PSR, which in turn was based on statements "lack[ing] sufficient indicia of reliability to meet the Government's burden of proving relevant conduct." Second, they claim that the court violated Rule 32(c)(3)(D)[11] of

11. Rule 32 was amended in 1994, with the result that this provision now appears in subdivision (c)(1), with minor textual changes.

12. "Commentary in the Guidelines Manual that interprets or explains a guideline is authoritative

the Federal Rules of Criminal Procedure when it failed to make specific findings with respect to disputed sentencing issues (i.e., the quantity of drugs that could be considered "relevant conduct"). Finally, they argue that the court failed to explain how the drug quantities it considered for sentencing purposes were part of the "same course of conduct" as the offense of conviction.

### A. "Relevant Conduct" Determinations Under § 1B1.3

Section 1B1.3 of the Sentencing Guidelines requires the district court to consider "relevant conduct" when calculating a defendant's base offense level. U.S.S.G. § 1B1.3. The court must consider, not just the criminal conduct with which the defendant was charged, but "all acts and omissions ... that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). "[I]n a drug distribution case," according to the Guidelines Commentary,[12] "quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction." U.S.S.G. § 1B1.3 cmt. 10. Thus, for example, the district court in this case was required to consider, not just the approximately 100 grams of cocaine involved in Demski's "offense of conviction" (attempted possession with intent to distribute cocaine on February 13, 1993), but the entire amount of cocaine involved during the period in which the Taylor conspiracy was active. One who participates in "jointly undertaken criminal activity," whether or not charged as conspiracy, may be held accountable for the reasonably foreseeable acts of his co-conspirators if those acts were committed in furtherance of the conspiracy. U.S.S.G. § 1B1.3, Application Note 2; *United States v. Savage*, 891 F.2d 145, 151 (7th Cir.1989).

unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, ———, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993).

As noted above, the district court adopted the probation office's calculations with respect to the appellants' relevant conduct. The pertinent section of the PSR (identical for each of the appellants) concluded that the Taylor conspiracy had been quite industrious between the Spring of 1992 and February of 1993:

> [W]e believe it is fair to say that trips to Illinois occurred on the average of six times per month. (By some accounts, the trips occurred every other week to once per week, by others they occurred every other day.) Clearly there was not a set amount of cocaine brought back on each occasion; it appears the amounts ranged from about two ounces to as much as eight ounces. It also appears that the frequency of the trips and the quantity brought back may have increased during the fall months of 1992. We believe an average of 4 ounces per trip is representative. Six trips per month × 4 ounces per trip = 24 ounces per month.
>
> *For Charles Taylor, Cathy Demski, and Gary Taylor, Sr.,* the computations are based on 9 months: May, June, July, August, September, October, November and December 1992 and January 1993, plus approximately 7 ounces obtained in Arizona and the 4 ounces obtained on or about February 12, 1993. Nine months × 24 ounces per month = 216 ounces. 216 ounces + 11 ounces = 227 ounces. 227 ounces × 28.35 grams per ounce = 6435 grams = *6.435 kilograms.*
>
> *For Harley Pryne,* the computations are based on 4 months: September, October and November 1992, and part of December 1992 and January 1993; plus approximately 7 ounces obtained in Arizona and the 4 ounces obtained on or about February 12, 1993. Pryne was hospitalized as a result of a drinking related crash on December 15, 1992 after which he entered inpatient AODA[13] treatment. He was released on January 20, 1993. Therefore, he is not credited for the entire months of December and January. Four months × 24 ounces per month = 96 ounces. 96 ounces

+ 11 ounces = 107 ounces. 107 ounces × 28.35 grams per ounce = 3303 grams = *3.033 kilograms.*

■ A district court's calculation of the quantity of narcotics attributable to a defendant under § 1B1.3 is a factual determination that we review deferentially:

> The government must prove the sentencing factors under the Guidelines [including relevant conduct] by a preponderance of the evidence. The factual findings of the district court will not be overturned unless they are clearly erroneous.... Thus, we will reverse the district court's conclusion as to the quantity of cocaine attributed to [a] defendant[ ] only if we have a definite and firm conviction that the district court made a clear mistake in sentencing. The district court is to base its determinations upon the evidence in the record and upon its own credibility evaluations. These credibility evaluations will be given utmost deference.

*United States v. Mumford,* 25 F.3d 461, 465 (7th Cir.1994) (citations omitted); *see also United States v. Garcia,* 66 F.3d 851, 856 (7th Cir.1995) (and cases cited therein); 18 U.S.C. § 3742(e) ("the court of appeals ... shall accept the findings of fact of the district court unless they are clearly erroneous").

■ The Government notes that while clear error is the standard of review to be applied to Demski and Gary Taylor, Sr., plain error is the standard with respect to Pryne because he waived the relevant conduct issue during sentencing. At the sentencing hearing, Pryne's attorney conceded "the equation of the pretrial services people" with respect to the monthly amounts of cocaine distributed by the Taylor conspiracy (i.e., 6 trips per month × 4 ounces per trip = 24 ounces per month). He nevertheless argued that the evidence demonstrated that Pryne had only been involved in the conspiracy during October, November, and "arguably one half of December." Therefore, only slightly more than two kilograms could be attributed to Pryne as relevant conduct.[14] However,

---

13. "AODA" stands for "Alcohol and Other Drug Addiction."

14. As noted above, in cases of "jointly undertaken criminal activity ... *whether or not charged as a conspiracy* ... a defendant is accountable for

Pryne's attorney admitted that two kilograms "still ... puts us in the same guideline [range] of 70 months to 87 months." By making these concessions on the relevant conduct issue, the Government argues, Pryne waived this issue on appeal and cannot have his sentence overturned unless the district court's findings were plainly erroneous. *United States v. Zarnes,* 33 F.3d 1454, 1474 (7th Cir.1994), *cert. denied* —— U.S. ——, 115 S.Ct. 2286, 132 L.Ed.2d 288 (1995). We agree with this analysis and also with the Government's ultimate conclusion that the differing standards of review are "merely academic because ... there was no error, clear, plain, or otherwise."

### B. The District Court's Reliance on the Presentence Investigation Reports

The appellants claim that the court improperly relied on drug quantity estimates prepared by the probation office, which in turn were based upon statements of "questionable reliability." According to the appellants, the PSR estimates were derived largely from the statements of admitted drug users, some of which contained internal inconsistencies, and the PSR often presented "conclusory facts" without attributing statements to their source.

 We do not agree with the appellants that the district court's reliance on the PSR was misplaced. While it is true that a criminal defendant "has a due process right to be sentenced on the basis of reliable information," *United States v. Westbrook,* 986 F.2d 180, 182 (7th Cir.1993) (citations omitted), it is well established that the evidentiary standards that apply to sentencing are not as stringent as those applicable in a criminal trial. The Criminal Code provides that:

No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United

States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C. § 3661. *See also* Fed.R.Evid. 1101(d)(3) and U.S.S.G. §. 6A1.3 (hearsay evidence is admissible at sentencing). When sentencing a defendant, "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States v. Harty,* 930 F.2d 1257, 1268 (7th Cir.1991), *quoting United States v. Tucker,* 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). "[S]o long as the information which the sentencing judge considers has sufficient indicia of reliability to support its probable accuracy, the information may properly be taken into account in passing sentence." *United States v. Cedano–Rojas,* 999 F.2d 1175, 1180 (7th Cir.1993); *see also* U.S.S.G. § 6A1.3(a). Provided that the facts contained in a PSR "bear sufficient indicia of reliability to support their probable accuracy," the district court may adopt them "as support for its findings and conclusions" regarding the quantity of drugs attributable to a defendant. *United States v. Salinas,* 62 F.3d 855, 859 (7th Cir.1995).

 We believe that the information relied upon by the probation office in calculating drug quantities, coming as it did from at least half a dozen individuals with first-hand knowledge of the drug-distribution network, bore "sufficient indicia of reliability" to support its "probable accuracy." Because the individuals who provided this information gave largely consistent and mutually-corroborating accounts, we are not overly concerned that some of these individuals were admitted drug users, nor are we troubled that they provided varying estimates of drug quantities.

---

the conduct ... of others that was both ... in furtherance of the jointly undertaken activity; and ... reasonably foreseeable." U.S.S.G. § 1B1.3, Application Note 2 (emphasis added). Thus, for sentencing purposes, Pryne could be held accountable for all of the Taylor conspiracy's reasonably foreseeable conduct, including the activity that occurred during Pryne's forced

"leave of absence" from the conspiracy. *See United States v. Tolson,* 988 F.2d 1494, 1502–03 (7th Cir.1993) (defendant could be held accountable for reasonably foreseeable conduct of his co-conspirators, even though conduct occurred during a two-year gap in the defendant's active participation in the conspiracy).

This court has held that a district judge should carefully scrutinize the statements of drug addicts (such as Pryne) before using them against a defendant for sentencing purposes. *United States v. Beler*, 20 F.3d 1428, 1435 (7th Cir.1994). However, such heightened scrutiny is not necessarily required when other factors demonstrate that the statement is reliable. In this case, for example, the statements relied upon by the probation department overlapped or corroborated one another to a significant extent, thus obviating the need for a searching inquiry into how drug use affected the reliability of a particular individual's statement. Furthermore, it is unrealistic for a criminal defendant to expect that government witnesses (in this case, the cooperating individuals who provided information to the probation department and to law enforcement officers) "possess the credibility of people of the cloth such as rabbis, [ministers], priests, and nuns." *Rodriguez v. Peters*, 63 F.3d 546, 563 n. 14 (7th Cir.1995).

Finally, we observe that the probation office did not take the estimates provided by Pryne and others at "face value." Rather, they arrived at a fairly conservative approximation (twenty four ounces per month) by multiplying an average amount of cocaine (four ounces per trip) by the probable frequency of trips (six per month). This process of "discounting" the estimates takes into account the possibility that drug use and other factors may have adversely affected perception and memory. Taken as a whole, the information provided by these individuals amply supports the conservative estimates of the probation department with respect to both the conspiracy's duration (Spring 1992 through February 1993) and the approximate amount of cocaine distributed per month (24 ounces).

The statements of Ray Ninneman, William Nelson, and Marilyn Draxler refute Demski's claim that the drug conspiracy did not begin until late July or August of 1992. Ninneman recalled that he began purchasing cocaine from Charles Taylor in the Spring of 1992. When testifying before the grand jury, William Nelson, Charles' first courier, stated that he ran drugs for Charles "basically all summer." His live-in girlfriend, Marilyn Draxler, recounted that the drug runs began in approximately May or June. It would appear, at the very least, that the conspiracy was in high gear by late June 1992, for Jason Craig stated that he learned of its operation immediately after moving in with Charles Taylor and Catherine Demski in early July of 1992.

Substantial evidence also refutes Demski's claim that the conspiracy ended in December 1992. Demski herself provided the most persuasive evidence of this when she spoke to Stacey Lecas in February of 1993. During that tape-recorded conversation, Demski said "We send Harley all the time." It is significant that Demski used the present tense, indicating that these trips were an ongoing practice, instead of saying "We used to send Harley all the time," or "We could send Harley again." In her objections to the PSR, Demski rather lamely asserts that her statements in this conversation cannot be credited because she was "exaggerating."

Harley Pryne's statements to undercover Detective Albers on February 12–13, 1992 provide further evidence that the drug distribution network continued to be active past December of 1992. Pryne described the conspiracy as an ongoing proposition and specifically mentioned that since the search of the Demski–Taylor apartment in December 1992, Charles Taylor no longer stored cocaine at the apartment but rather at his house in Wisconsin Rapids.

Finally, Tom Arnold, one of the conspiracy's customers, stated that he purchased approximately two ounces of cocaine each month from Gary and Charles Taylor from the end of 1992 through the middle of 1993. Arnold wrote Demski a check for $1,600 (which she cashed) in anticipation of receiving cocaine from the February 12, 1993 run.

Ample evidence also supports the conclusion (adopted by the district court) that the drug runs to Illinois occurred on average six times per month and involved approximately four ounces of cocaine per trip. The statements of Ray Ninneman, Chad Kuehl, Harley Pryne, Jason Craig, and William Nelson are, for the most part, consistent and corroborated, despite the fact that they provide

differing estimates of exactly how often the drug runs occurred and precisely how much cocaine was involved.

As the Government observes in its brief, the probation office (and by extension, the district court) "did not wholly accept the estimates of [these individuals], but rather, balanced the conflicting accounts and arrived at a reasonable representative monthly average [of 24 ounces]." This process of approximation or estimation is perfectly acceptable. *See Mumford,* 25 F.3d at 467; U.S.S.G. § 2D1.1 cmt. 12. We have held that as long as "nebulous eyeballing" is avoided, "factual determinations under the Guidelines need not emulate the precision of Newtonian Physics." *United States v. Duarte,* 950 F.2d 1255, 1265 (7th Cir.1991), *cert. denied* 506 U.S. 859, 113 S.Ct. 174, 121 L.Ed.2d 120 (1992). The district court, after reviewing the PSR, the Government's account of the Taylor conspiracy, and the defendants' objections to the PSR, was obviously satisfied that the probation office had not engaged in mere guesswork or "nebulous eyeballing," but rather had arrived at a responsible approximation of what occurred.

Demski, now joined by appellants Pryne and Gary Taylor, Sr.,[15] asserts that the conspiracy began later, ended sooner, and involved smaller amounts of narcotics. In her written narrative of events, submitted at sentencing along with detailed objections to the PSR, Demski recalled that "August of 1992 is when we got into cocaine" and that she and Charles "got out of dealing" in December 1992, following the "raid" on their apartment. Demski was certain that there was no drug-dealing while Charles' daughter Tonya was living in Wisconsin Rapids (through June of 1992), or after the search of the apartment in December 1992. Demski also claimed that "the quantity we dealt with was about two to three ounces a week, sometimes skipping a week in between, for approximately four months." Based upon these estimates, the conspiracy only trafficked in a total of 77 ounces, or 2.183 kilograms of cocaine (including the amounts from the Arizona trip and taking account of some periods during which Demski claims there were no drug runs to Illinois).

The court decided not to credit Demski's self-serving assertions in light of substantial evidence to the contrary in the PSR, particularly the mutually-corroborated statements of a number of the co-conspirators. The court specifically rejected Demski's assertion that the conspiracy was active for a shorter period of time than alleged in the PSR, stating that Demski's version of events:

> simply does not jibe with all of the information from all of these other people as to when they were starting to get cocaine from your husband.[16] ... It doesn't jibe with Ms. Draxler's statement about when she was getting cocaine. It doesn't jibe with Mr. Nelson's statements.... It doesn't jibe with the statement that Mr. Nelson gave at the grand jury that the conspiracy went on all summer and into mid-November or a period of at least five to six months. It simply doesn't jibe with all of the other information, and I think it is given simply to make your role, your responsibility, more minimal.

> The other end of the conspiracy, it doesn't make sense either because you say ... that you absolutely stopped when the search warrant was executed and that is not what the evidence shows. The evidence shows that the conspiracy continued and we got a tape recording of your talking on the telephone in February [1992 to Stacey Lecas] saying this is what we do, this is how we run the conspiracy. We send Harley down for this and we pay for this and do this. So my view is simply that you have not accepted responsibility for the extent of your involvement in this conspiracy and for the scope and nature of the conspiracy that you were involved in.

We hold that the district court's reliance on the information in the PSR was proper.

---

**15.** Although he claimed to be at a disadvantage because of "calendar illiteracy," Gary Taylor, Sr. nevertheless adopted Demski's account of the conspiracy. Harley Pryne adopts Demski's version of events for the first time on appeal, having accepted some of the probation office's calculations at the sentencing hearing.

**16.** Catherine Demski and Charles Taylor were married on August 6, 1994.

The recitation of facts contained in the PSR was based upon statements provided by several of the co-conspirators to the grand jury or to law enforcement officers or the probation department. As discussed above, these statements are largely consistent and mutually-corroborating; they thus bear "indicia of reliability" sufficient to demonstrate their probable accuracy. The district court therefore did not commit clear error when it chose to adopt the calculations of the probation officer rather than the self-serving assertions of the appellants with respect to drug quantities because, "if two permissible views exist, the fact-finder's choice between them cannot be clearly erroneous." *United States v. McDonald,* 22 F.3d 139, 144 (7th Cir.1994).

### C. The District Court's Compliance with Rule 32

■ The appellants argue that their sentences should be set aside because the district court failed to make detailed, specific findings with respect to all of their objections to the PSRs. Under the Federal Rules of Criminal Procedure, if a defendant alleges:

> any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing.

Fed.R.Crim.P. 32(c)(3)(D).

As an initial matter, the statements made by the sentencing judge reflect that she *did* consider the record in its totality and *did* make findings on the "matters controverted," as required by Rule 32, even though she largely pointed to the PSR instead of providing detailed responses to each of the defendants' objections.[17] The appellants rely heavily on *United States v. Jewel,* in which we held that a district court's refusal "to respond to each specific objection to a PSR" was "inconsistent with the court's obligation

under Federal Rule of Criminal Procedure 32(c)(3)(D)." 947 F.2d 224, 234 (7th Cir. 1991). In *Jewel,* the defendants made a number of substantive objections to the PSR which the sentencing court glossed over by saying that it would not "go through each allegation." In the instant case, by contrast, the district court did address the major disputed issues before it. The court explicitly rejected Catherine Demski's claims that the conspiracy was active for a shorter time than alleged in the PSR and that it trafficked in smaller quantities of cocaine. The sentencing judge noted repeatedly that Demski's version did not "jibe" with all the other information before her. The judge also made a specific finding that *Demski was not credible,* stating that Demski had been *less than truthful in order to minimize her role in the conspiracy.* At the sentencing hearing, the court adopted the calculations proposed by the probation office for Demski, noting that they "[took] into account *all of the defendant's relevant conduct."* The court made similar oral findings with respect to appellants Pryne and Gary Taylor, Sr. The court also set forth its findings in a written judgment entered after sentencing Demski. Under the heading "Statement of Reasons," the court wrote:

> I adopt the guideline calculations purposed [sic] by the Probation Office.... I conclude that it cannot be shown by a preponderance of the evidence that defendant was a manager or supervisor of the conspiracy, but that it can be shown that she made a false denial of relevant conduct: the extent of the conspiracy, the length of time it lasted and the amount of drugs distributed.
>
> *The probation office calculations take into account all of the defendant's relevant conduct,* pursuant to § 1B1.3(a)(1) and (2).

(emphasis added). The court made similar written findings in the judgments entered against Pryne and Gary Taylor, Sr.

This court has held that while "[e]xplicit findings are generally required [under Rule

---

17. Even if the district court had failed to make such findings, we are doubtful that this would constitute reversible error because the record provides an adequate basis for the court's conclusions. *See, e.g., United States v. Baker,* 40 F.3d

154, 163 (7th Cir.1994), *cert. denied* — U.S. ——, 115 S.Ct. 1383, 131 L.Ed.2d 237 (1995); *United States v. Carson,* 9 F.3d 576, 585 (7th Cir.1993), *cert. denied* — U.S. ——, 115 S.Ct. 135, 130 L.Ed.2d 77 (1994).

32] ... there are no 'magic words' a court must use; so long as it actually resolves the disputed issues on the record, a sentencing court fulfills the purposes of Rule 32." *United States v. Coonce*, 961 F.2d 1268, 1278 (7th Cir.1992). We are convinced that the district court complied with Rule 32 by resolving the disputed issues on the record, particularly the issue of drug quantities attributable to the defendants.

■■■ Nor are we troubled by the court's reliance on the PSR. Under our decisions, a court may satisfy the requirements of Rule 32 by adopting the factual findings and calculations contained in a PSR, provided that those findings are based upon sufficiently reliable information. *United States v. LaGrone*, 43 F.3d 332, 340 (7th Cir.1994); *Zarnes*, 33 F.3d at 1474; *United States v. Musa*, 946 F.2d 1297, 1308 (7th Cir.1991). In fact, when a defendant has failed to produce any evidence calling the report's accuracy into question, a district court may rely entirely on the PSR:

> Generally, where a court relies on a PSR in sentencing, it is the defendant's task to show the trial judge that the facts considered in the PSR are inaccurate. *A defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth.* Instead, beyond such a 'bare denial,' he must produce some evidence that 'calls the reliability or correctness of the alleged facts into question.' If a defendant meets this burden of production, the government must then convince the court that the PSR's facts are actually true. But the defendant gets no free ride; he *must produce more than a bare denial, or the judge may rely entirely on the PSR.*

*United States v. Mustread*, 42 F.3d 1097, 1101 (7th Cir.1994) (citations omitted, emphasis added). Only when the defendant has met this burden of production does the burden of persuasion shift back to the prosecution, which must then convince the court that the facts presented by the Government are actually true. *Coonce*, 961 F.2d at 1280.

We applied these principles in the case of *United States v. Isirov*, 986 F.2d 183 (7th Cir.1993). Isirov pleaded guilty to conspiracy to distribute cocaine. Prior to sentencing, he filed written objections to the PSR, claiming that he was only responsible for distribution of approximately two kilograms of cocaine, rather than the seven alleged in the PSR. The district court overruled Isirov's objections to the PSR and adopted the findings contained in the PSR, which it found to be based upon sufficiently reliable investigative reports and statements from cooperating witnesses. On appeal, Isirov contended that the district court's "perfunctory examination" of his objections violated Rule 32(c)(3)(D). We upheld the district court, on the grounds that Isirov had failed to produce any evidence beyond a bare denial that would call into question the factual allegations contained in the PSR. *Id.* at 186.

The appellants' claims with respect to Rule 32(c)(3)(D) are nearly identical to those of Isirov. In light of the appellants' failure to produce any evidence other than their own self-serving denials of the PSR's accuracy, we hold that the district court satisfied the requirements of Rule 32 when it adopted as its own the findings of the PSR. In the absence of actual evidence controverting the information in the PSR, i.e., something more than the appellants' mere denials, it was not necessary for the court to conduct any further inquiry into the disputed sentencing issues.

### D. The District Court's Compliance with § 1B1.3

■■ Under the "aggregation rule" embodied in § 1B1.3 of the Guidelines, a court must consider "relevant conduct" when it calculates a base offense level. In other words, the court must consider all drug quantities that were part of the "same course of conduct" or "common scheme or plan" as the offense of conviction, even though the defendant was never charged in connection with those particular drug transactions. Relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of ... jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). Thus, "[a] district[ ] court may correctly aggregate all the quantities of drugs involved in an entire, basic scheme of multiple defendants when it determines an individual defendant's

base offense level." *Mumford*, 25 F.3d at 465.

The appellants argue that the court failed to explain how the relevant conduct (i.e., the numerous acts of drug-trafficking by the Taylor conspiracy) and the offense of conviction (the possession or attempted possession with intent to distribute of approximately 100 grams of cocaine on February 13, 1993) were part of the same "course of conduct" or "common scheme or plan."

The Government side-steps this issue, focusing instead on the fact that the appellants got "better deals" under their respective plea agreements than they ever would have received if convicted of conspiracy to distribute cocaine, which carries a ten-year minimum sentence (Count I of the indictment against them). While this is undoubtedly true, it does not address the district court's failure to state explicitly its finding that the "relevant conduct" and the offense of conviction were part of a "common scheme or plan" or the "same course of conduct."

The commentary accompanying the Guidelines explains that "common scheme or plan" and "same course of conduct" are "two closely related concepts." Two or more offenses are part of a common scheme or plan if they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi.*" Offenses are part of the same course of conduct if they are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." Factors indicating that two or more offenses are part of the same course of conduct include "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." U.S.S.G. § 1B1.3(a). *See also Cedano–Rojas*, 999 F.2d at 1180 (factors include "similarity, regularity, and temporal proximity of the incidents in question"); *United States v. Hatchett*, 31 F.3d 1411, 1419 (7th Cir.1994) (factors include similarity of parties, geographic relationship, temporal relationship, and "any other relationship between the convicted offense and the relevant conduct").

We agree with the appellants that the district court should have been more explicit about the relationship between the "relevant conduct" and the offense of conviction in this case. When a court aggregates drug quantities under the "same course of conduct" or aggregation rule, we have held that it "should explicitly state and support" its finding that the drug amounts considered as part of the same course of conduct "bore the necessary relation to the convicted offense." *Duarte*, 950 F.2d at 1263. However, in light of the totality of the evidence in this record, and the sentencing judge's careful review of the same, we believe that it would be pointless for this court to remand or vacate the sentences of Demski, Pryne, and Gary Taylor simply because the judge failed to make explicit, by invoking the "magic words" of the Sentencing Guidelines, that the "offense of conviction" was part of a "common scheme or plan" or an ongoing "course of conduct." *See United States v. Thomas*, 969 F.2d 352, 355 (7th Cir.1992), *cert. denied* 506 U.S. 896, 113 S.Ct. 274, 121 L.Ed.2d 202 (1992) (facts in PSR justified upholding the district court's relevant conduct finding "despite its failure to provide an adequate discussion of the issue"); *Coonce*, 961 F.2d at 1278 (although explicit findings are generally required in sentencing, "there are no 'magic words' a court must use"). It seems most obvious that the offense of conviction was part of a larger, ongoing operation.

The record amply supports a conclusion that the relevant conduct in this case bore the necessary relationship to the offense of conviction. The incidents of drug-dealing that comprised the Taylor conspiracy were not isolated events. Rather, they were very similar, occurred at regular intervals, and took place within a comparatively short time frame (Spring 1992 through February 1993). These incidents also involved many of the same individuals (at least in the key roles) and reflected the same basic *modus operandi*. In short, "the information in the PSI report ... adopted by the court demonstrates a temporal and locational relationship

among the drug [transactions] in question, and supports the district court's finding of relevant conduct." *Id.*

Although the district court never used the "magic words" of the Sentencing Guidelines, it did orally state and memorialize in writing that the drug quantity calculations prepared by the probation office had "take[n] into account all of the defendant[s'] relevant conduct." The court also repeatedly referred to the defendants' participation in an ongoing conspiracy to distribute drugs, which is another way of saying that the individual acts of drug-dealing, including the offense of conviction, were part of the same course of conduct or common scheme or plan. The court, in its opinion, even set forth in specific language that the conspiracy continued through (and encompassed) the February 12–13, 1993 transaction that constituted the offense of conviction, citing the telephone conversation between Stacey Lecas and Catherine Demski as evidence of this.

*We see no reason to disturb the sentences in this case merely because the judge failed to invoke the exact wording of the Guidelines with respect to relevant conduct.* It was very clear throughout the proceedings that the court deemed all of the Taylor conspiracy's drug-trafficking activity "relevant conduct." Indeed, the appellants did not challenge this notion during the proceedings except to argue that the relevant conduct was shorter in duration and involved smaller amounts of drugs.

## II. Catherine Demski: Acceptance of Responsibility

### A. Acceptance of Responsibility Determinations Under § 3E1.1

The Sentencing Guidelines authorize a district court judge to reduce a defendant's base offense level by two points "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a).

A further reduction of one point is authorized for a defendant whose base offense level is at least 16 and who has assisted authorities in the investigation or prosecution of his case. U.S.S.G. § 3E1.1(b). Demski asserts that the district court clearly erred when it denied her a reduction of three points pursuant to § 3E1.1(a) and (b).

"The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review." U.S.S.G. § 3E1.1 cmt. 5. Our decisions have held that acceptance of responsibility is a factual matter that "enjoys the protection of the 'clearly erroneous' standard." *United States v. Beal,* 960 F.2d 629, 632 (7th Cir.1992), *cert. denied* 506 U.S. 880, 113 S.Ct. 230, 121 L.Ed.2d 166 (1992) (citation omitted). "Because the trial court's assessment of a defendant's contrition will depend heavily on credibility assessments, the 'clearly erroneous' standard will nearly always sustain the judgment of the district court in this area." *Id.* Furthermore, "the defendant bears the burden of proving that he is entitled to a reduction in base offense level for acceptance of responsibility." *United States v. Schuler,* 34 F.3d 457, 460 (7th Cir.1994).

■ Demski claims that she clearly demonstrated her acceptance of responsibility by pleading guilty,[18] admitting her role in the conspiracy, and cooperating fully with law enforcement officers. She notes that counsel for the Government, consistent with the plea agreement, stated at the sentencing hearing that there was a "reasonable basis" for an acceptance-of-responsibility reduction. Demski also notes that the probation office recommended a reduction in its original presentence report, but then withdrew that recommendation in an amended report filed the day before the sentencing hearing. In addition to asserting that the last-minute filing of the amended PSR prejudiced her ability to

---

**18.** Under the Sentencing Guidelines, "[a] defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right." U.S.S.G. § 3E1.1. *See also United States v. Jones,* 52 F.3d 697, 701 (7th Cir.1995), and cases cited therein. This is especially true when

the district court, subsequent to the entry of a guilty plea, determines that a defendant has not fully admitted the extent of his or her participation in criminal activity, or, as in this case, when the court finds that defendant has actively attempted to minimize his or her role. *Id.*

prepare fully for the sentencing hearing, Demski makes a more fundamental claim: that the court, by denying an acceptance-of-responsibility reduction, "punished [her] for exercising her right to challenge the accuracy of the presentence report."

### B. The Late Filing of the Amended PSR

■ Initially, we address Demski's claim that the filing of the amended PSR within ten days of her sentencing hearing prejudiced her ability to prepare adequately for the hearing. The amended report was filed four days after Demski made her objections to the original PSR, and just one day before the sentencing hearing. This, according to Demski, violated 18 U.S.C. § 3552(d), which requires that a presentence report be "disclosed to the defendant, the counsel for the defendant, and the attorney for the Government at least ten days prior to the date set for sentencing, unless this minimum period is waived by the defendant." 18 U.S.C. § 3552(d).

It is true that Demski had a right to have the PSR disclosed to her at least ten days before the sentencing hearing, and that she did not waive this right by failing to object to the late-filing at the sentencing hearing.[19] See United States v. Blythe, 944 F.2d 356 (7th Cir.1991) (a defendant waives rights under 18 U.S.C. § 3552(d) if he makes no objection at the appropriate time). However, we do not believe that the probation office's eleventh-hour filing of the amended PSR significantly affected Ms. Demski's right to a fair sentencing hearing. We do not believe that this procedural misstep warrants disturbing the sentence of the district court, which, as discussed elsewhere in this opinion, was well-founded and not clearly erroneous.

We note that when Demski's attorney raised the issue of the amended PSR at the hearing, the sentencing judge stated very directly "I'm not taking it into account so you don't need to respond to it." Counsel for Demski did not request an adjournment or express any dissatisfaction with the judge's statement that she would not take the

amended PSR into account. Moreover, the law is clear that a sentencing judge is not bound by the PSR's recommendations concerning sentence. United States v. Heilprin, 910 F.2d 471, 475 (7th Cir.1990). We also observe that Demski's counsel was either lucky, clairvoyant, or extremely quick on her feet, for she did present cogent arguments in favor of a reduction for acceptance of responsibility, despite the lack of time in which to prepare. Demski thus had "an opportunity to comment upon the probation officer's determination and on other matters relating to the appropriate sentence," as required by Fed.R.Crim.P. 32.

### C. Demski's Denial of Relevant Conduct

■ Demski also argues that the court impermissibly denied her a 3E1.1 reduction because she challenged the accuracy of the PSR. We do not agree with this characterization of the district court's findings, nor do we think that the district court committed clear error in denying a three-level reduction pursuant to 3E1.1. We begin our analysis by reviewing the district court's reasons for denying the reduction. At the sentencing hearing, the judge stated:

I am not going to give you a three level reduction for acceptance of responsibility. It is perfectly appropriate to contest the amounts of drugs, the time limit of a conspiracy, just as it is appropriate to take the witness stand during the trial and to testify. It is not appropriate, however, to lie on the witness stand or to deny frivolously the extent of your involvement in the conspiracy.

The judge went on to note the discrepancies between Demski's version of events and all of the other information before her, repeatedly stating that Demski's version did not "jibe" with the accounts provided by others. She concluded by stating her opinion that Demski had tried to minimize her role in (and responsibility for) the acts of the conspiracy. In her written judgment, the judge summarized, stating "it can be shown that [the defendant] made a false denial of relevant

---

**19.** Demski's counsel stated that she would have "a difficult time arguing" in response to the amended PSR, because she had only received it

by facsimile transmission late on the afternoon before the sentencing hearing.

conduct" regarding "the extent of the conspiracy, the length of time it lasted and the amount of drugs distributed."

This court has interpreted the current version of § 3E1.1(a)[20] to mean that "[i]f a defendant denies relevant conduct and the court determines such conduct occurred, the defendant cannot claim to have accepted responsibility for his actions." *United States v. Brown,* 47 F.3d 198, 204 (7th Cir.1995); *see also Cedano–Rojas,* 999 F.2d at 1182; *United States v. White,* 993 F.2d 147, 150–51 (7th Cir.1993). Further, we have held that "if a defendant denies the government's statement of relevant conduct ... he thereby exposes his denials to the scrutiny of the court." *Brown,* 47 F.3d at 204. At the same time, a defendant "is not required to affirmatively 'come clean' on relevant conduct in order to obtain the reduction." *Schuler,* 34 F.3d at 460. In other words, silence remains an option. This understanding of § 3E1.1 is consistent with the Commentary accompanying § 3E1.1, which instructs the sentencing judge to consider whether the defendant has:

> truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and truthfully admitt[ed] or not falsely den[ied] any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. *However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with the acceptance of responsibility.*

U.S.S.G. § 3E1.1, cmt. 1(a) (emphasis added).

After considering the PSR, the Government's account of the Taylor conspiracy, and Demski's objections to the PSR, the district court refused to accept Demski's version of events and made a specific finding that she was not credible. It did not believe Demski's claim that the conspiracy commenced in late July or August of 1992, or her claim that the conspiracy ceased after the December 1992 search of her apartment, or her assertion that the drug runs to Illinois typically involved smaller quantities of cocaine than alleged in the PSR. The district court determined that Demski was responsible for between five and fifteen kilograms of cocaine. In light of this factual finding by the court, which was supported by substantial evidence, Demski's uncorroborated and self-serving assertions must be considered a "false denial" of relevant conduct. Having falsely denied relevant conduct, Demski cannot also claim to have accepted responsibility for that conduct. As this court has observed, "[c]ontesting the veracity of the alleged relevant conduct is no doubt permissible and often perfectly appropriate. However, if a defendant denies the conduct and the court determines it to be true, the defendant cannot then claim that he has accepted responsibility for his actions." *Schuler,* 34 F.3d at 461 (quotation omitted).

Finally, we note that the district court based its 3E1.1 determination partly on an evaluation of Demski's credibility. The sentencing judge concluded that Demski's version of events was inspired by a desire "simply to make [her] role, [her] responsibility, more minimal." We have held that "a desire to minimize a criminal sentence is distinguishable from acceptance of responsibility" and that the former "will not provide a basis for a 3E1.1 reduction." *White,* 993 F.2d at 151. In any case, an appellate court is ill-equipped to assess whether a particular defendant is motivated by genuine acceptance of responsibility or by a self-serving desire to minimize his own punishment. Unlike the

---

20. Prior to the November 1, 1992 amendment to the Guidelines, a reduction was permitted only if the defendant accepted responsibility for his "criminal conduct," which included both the conduct underlying the offense and uncharged conduct related to that offense. The 1992 amendment substitutes the term "offense" for the term "criminal conduct," but still permits a district court to deny an acceptance-of-responsibility reduction if it determines that the defendant "falsely denied" relevant conduct under § 1B1.3.

**552**

district court judge, we do not enjoy a "front row seat" from which to assess Demski's statements and demeanor. *Id.* This difference in perspective, i.e., our inability to review the intangible factors that go into making a factual determination, further persuades us that we should not disturb the district court's denial of an acceptance-of-responsibility reduction for Catherine Demski.

## CONCLUSION

We are not left with a "definite and firm conviction" that the district court was mistaken when it determined the amounts of cocaine attributable to the appellants for sentencing purposes. Nor are we persuaded that the court clearly erred when it denied Demski a reduction in her offense level for acceptance of responsibility. Accordingly, we AFFIRM the sentences of Catherine Demski, Harley Pryne, and Gary Taylor, Sr.