In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-3156

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JUAN CARLOS PEREZ,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 18-CR-27 — **James D. Peterson**, *Chief Judge*.

ARGUED SEPTEMBER 18, 2019 — DECIDED APRIL 23, 2020

Before KANNE, HAMILTON, and BARRETT, *Circuit Judges*.

KANNE, *Circuit Judge*. In December 2016, law enforcement officers facilitated a controlled buy of heroin from Juan Perez——someone the officers suspected was a high-level drug dealer in the Beloit, Wisconsin area. The controlled buy was recorded: Perez sold 98 grams of heroin to a police informant. Based on that transaction alone, Perez was charged with, and pled guilty to, distributing heroin.

At Perez's sentencing hearing, the district judge expressed concern that the guidelines range of 33–41 months' imprisonment presented in Perez's presentence investigation report ("PSR") did not reflect the full scope of his involvement in drug trafficking. This concern stemmed from the PSR's description of Perez's conduct suggesting that he was responsible for distributing large quantities of heroin, methamphetamine, and cocaine.

Unsatisfied with the disparity between Perez's guidelines range and his conduct described in the PSR, the judge continued the sentencing hearing and directed the government to file a sentencing memorandum. The memorandum was to detail which offense conduct the government could support by a preponderance of the evidence and which offense conduct it could not so support. When the parties and judge reconvened, the government presented witness testimony that elaborated on conduct described in the PSR. The judge used that evidence to calculate a higher guidelines range and impose a 121-month sentence.

Perez appealed his sentence, arguing that the sentencing judge should have disqualified himself because his impartiality might reasonably be questioned. *See* 28 U.S.C. § 455(a). Because Perez has not demonstrated that a reasonable observer would have questioned the judge's impartiality, we affirm the sentence.

## I. BACKGROUND

Perez was charged with only one crime—distribution of heroin, 21 U.S.C. § 841(a)(1)—based on the single $8,000 sale of 98 grams of heroin to a police informant. But Perez's PSR describes additional conduct that portrays this crime as a

small piece of a much larger criminal enterprise. We detail a sampling of this conduct below.

Beginning in late 2015, confidential informants identified Perez as a high-level supplier of heroin, meth, and cocaine. The informants said that Perez handed out cell phones to his customers to conduct his drug business, and they believed that Perez was connected to the notorious Sinaloa drug cartel. Indeed, law enforcement officers found ten cell phones in Perez's vehicle during two traffic stops. Finding this number of cell phones suspicious, law enforcement searched Perez's mother's home, with her permission. There they found notebooks that looked like drug ledgers: the ledgers included individuals' names, charts connecting various names, telephone numbers, vehicle descriptions, and entries totaling hundreds of thousands of dollars.

Adding to these incidents, Perez told a police informant that he could supply a pound of heroin for $10,000; that he had 700 grams of heroin for sale; that he had access to five kilograms of heroin; and that he was looking for firearms.

Not only did the PSR describe Perez's extensive involvement in distributing heroin, but it indicated that Perez had access and the willingness to sell large quantities of meth. For starters, Perez offered to sell the informant a pound of meth for $8,000 (mirroring the $8,000 sale of heroin that Perez completed). Other informants also identified Perez as a supplier of meth. One woman, Cheryl Barrera, confirmed this suspicion. In October 2016, law enforcement arrested Barrera on her way to sell more than 400 grams of meth to her brother. Unbeknownst to Barrera, her brother was a police informant. After Barrera's arrest, she told police that Perez supplied the meth and expected $14,000 in return. She also revealed that

Perez said he had three more pounds of meth, as well as heroin and cocaine, and that she used a cell phone provided by Perez to arrange the purchase of the meth with her brother.

Further investigation led law enforcement officers to the apartment of Perez's girlfriend. Inside, officers found the following: more than $152,000 in cash, most of which was duct-taped inside plastic bags and hidden in a heating vent; two Drug Enforcement Administration (DEA) Notice of Seizure forms, indicating that about $500,000 had been seized by the government; Perez's passport; a money counter; a money transfer receipt from Des Plaines, Illinois to Sinaloa, Mexico; handwritten receipts; and a notebook including names, telephone numbers, addresses, and dollar amounts.

Eventually, in January 2018, law enforcement officers arrested Perez for the 2016 controlled purchase of heroin. After Perez's arrest, law enforcement officers interviewed his girlfriend. She revealed that Perez called her from jail and asked her to write down his cell phone contacts and throw away his cell phones. He also directed her to call his friend in Mexico, say the code word "CHA-18," and inform the friend that Perez would not talk to the police.

Concluding this account of Perez's involvement in large-quantity drug distribution, the PSR stated:

> Though the defendant's conduct suggests he is responsible for distributing large quantities of multiple controlled substances over several months, the probation office believes the defendant is responsible for distributing, conservatively, 98 grams of heroin. This drug quantity is based solely on the controlled purchase completed on December 5, 2016.

Based on that 98-gram quantity, Perez's base offense level was 22, which was adjusted to level 19 for Perez's acceptance

of responsibility. That offense level and Perez's criminal history category of II produced a guidelines range of 33–41 months' imprisonment.

At Perez's sentencing hearing, the judge voiced his distress over the disparity between the high-level drug activity described in the PSR and Perez's charged offense—a disparity the judge characterized as "a grotesque mismatch" between Perez's guidelines range and his offense conduct. The judge and the government engaged in an extended back-and-forth about evidence in the PSR indicating that Perez trafficked a high volume of drugs. The government justified its charging decision by explaining that it conservatively estimated Perez's relevant conduct based only on the controlled buy because it could not corroborate the other behavior described in the PSR. For example, the government explained the DEA seizure notices and money weren't "completely solid" evidence of relevant conduct because they were not found at Perez's residence. Similarly, the government lacked additional surveillance confirming informant tips identifying Perez as a supplier.

In response, the judge said he was "in the uncomfortable situation of seeing what appears to me to be very solid evidence, at least to a preponderance of the evidence, that suggests that Mr. Perez was far more involved than 98 grams and [the government is] agreeing with me." He continued, "even if we can't put an exact amount on the weight, we can establish the length of the time, the number of the transactions, because we have the drug ledgers. And so I want to know what it is that the government can support." With that, the judge continued the sentencing hearing and asked the parties to file additional briefing:

> I want the government to be able to tell me – you can do it in a memo, because I think the probation office has done what they could with the information that they have here – but I want to know, of the background and the description of the offense conduct, what is it that the government is willing to present to me as information they can establish beyond – to a preponderance of the evidence.

> And I understand that you're not able to quantify the drug amount any better than the amount that was seized in the controlled buy that produced the 98 grams. But if you have concerns that you don't trust some of the witnesses that you might have or the informants, then you ought to tell me that and then I won't rely on it so much. But if you've got information here that goes to Mr. Perez's culpability beyond just the drug quantity, I want to know that, because I would be comfortable either departing or varying on the basis of other indicators of Mr. Perez's culpability, which at the moment seems quite compelling to me and that Mr. Perez has not challenged.

As instructed, the government filed a memorandum, and defense counsel responded.

When the parties reconvened for the sentencing hearing, the judge said he would hear from the parties and then make clear which parts of the PSR he was relying on. The government presented two witnesses: Cheryl Barrera, and a police officer who surveilled and arrested her. Each testified about Barrera's attempted sale of meth to her brother. Critically, Barrera testified that Perez supplied her with 435 grams of meth. Ultimately, the judge determined that a preponderance of the evidence supported a conclusion that Perez supplied Barrera with the meth.

Before sentencing Perez, the judge calculated Perez's base offense level as 32, based on 98 grams of heroin from the controlled buy and 435 grams of methamphetamine he supplied to Barrera. The judge calculated Perez's guidelines range as 97–121 months and imposed a sentence of 121 months' imprisonment. Perez appealed his sentence.

## II. ANALYSIS

Perez argues that the sentencing judge should have recused himself under 28 U.S.C. § 455(a), which states: "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

We ultimately conclude that a reasonable observer would not question the judge's impartiality because he continued the sentencing hearing and relied on additional evidence in rendering Perez's sentence. But before we delve into the merits of Perez's arguments about the judge's impartiality, a brief discussion of the appropriate standard of review is warranted.

### A. Standard of Review

We begin with the language of § 455(a)—that the judge "shall disqualify himself." This language, we have recognized, places the onus on the judge to initiate his or her recusal, and it "affects what role the litigants must play" in requesting recusal. *Fowler v. Butts*, 829 F.3d 788, 794–95 (7th Cir. 2016). In that vein, a litigant does not have to raise a § 455 challenge before the trial judge to have our court review whether the judge should have recused him or herself. *See id.* at 795. But the availability of review—regardless of whether a

litigant moved for recusal—does not resolve what standard of review applies.

Perez did not move during sentencing for the judge's recusal under § 455(a). We review challenges raised for the first time on appeal for plain error, Fed. R. Crim. P. 52(b), which means we may correct a forfeited error only when it is "plain" and "affects substantial rights." *Id.* However, the analytical tools we use to determine whether these criteria are met depends on the kind of error alleged. "[I]n *most cases*," the alleged error "affects substantial rights" only if it was "prejudicial: [i]t must have affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734 (1993) (emphasis added). But most is not all; and disqualification errors under § 455 are an unusual breed, requiring departure from the usual analytic metric.

The appropriate metric for the alleged error here reflects one that applies when we consider whether a recusal error was harmless. In *United States v. Atwood*, 941 F.3d 883 (7th Cir. 2019), we recognized that "[t]o determine whether a judge's violation of § 455(a) was harmless error, we look to the three factors outlined in *Liljeberg v. Health Services Acquisition Corp.*: (1) the risk of injustice to the parties in this case, (2) the risk of injustice to parties in future cases, and (3) the risk of undermining public confidence in the judicial process. 486 U.S. 847, 864 (1988)." *Atwood*, 941 F.3d at 885.

As dictated by Federal Rule of Criminal Procedure 52(a) and 52(b), the so-called "harmlessness" and "plain error" inquiries largely mirror one another. *See Olano*, 507 U.S. at 734–35. The difference is who bears the burden to show that the error did or did not affect substantial rights. *See id.* at 734. Accordingly, to determine whether the "substantial rights"

requirement of Rule 52(b) has been met, we look to the three factors set out in *Liljeberg*. These factors are particularly appropriate because violations of § 455 affect the integrity of and public confidence in the judicial system as a whole, and because a judge always has an independent obligation to watch for potential disqualification pitfalls. *See Fowler*, 829 F.3d at 794.

Thus, when a defendant raises a § 455 error for the first time on appeal, we review the challenge for plain error: we ask whether the defendant has shown that the error was obvious, affects substantial rights (as defined by the *Liljeberg* factors), and "seriously affects the fairness, integrity, or public reputation of the proceedings." *United States v Garrett*, 528 F.3d 525, 527 (7th Cir. 2008).[1]

Perez has not overcome the first requirement to show the error was obvious. Specifically, he failed to demonstrate that the judge should have recused himself because of an appearance of partiality.

*B.  Impartiality Under § 455(a)*

Perez asserts that a reasonable observer would have questioned the judge's impartiality based on: (1) the judge's *sua sponte* continuance of Perez's sentencing and direction to the government to submit additional briefing that would support a higher guidelines range; and (2) the judge's reliance on new evidence presented by the government in its memorandum

---

[1] While that last requirement overlaps with the *Liljeberg* factors, it is not the same; it measures the seriousness of the risks that the *Liljeberg* factors identify.

and at the continued sentencing hearing to produce a higher guidelines range.

Section 455(a) requires a judge to recuse himself from a proceeding if a reasonable, well-informed observer might question the judge's impartiality or "entertain a significant doubt that justice would be done in the case." *United States v. Herrera-Valdez*, 826 F.3d 912, 917 (7th Cir. 2016); *see* 28 U.S.C. § 455(a).

A party bears a heavy burden when seeking a judge's recusal for rulings made during litigation or for opinions the judge forms based on facts introduced during a case. *See Liteky v. United States*, 510 U.S. 540, 555 (1994). In that context, we do not require a judge's recusal unless a ruling or opinion makes "fair judgment impossible." *In re City of Milwaukee*, 788 F.3d 717, 720 (7th Cir. 2015) (quoting *Liteky*, 510 U.S at 555). In addition, a judge's "ordinary efforts at courtroom administration" or docket management are "immune" from claims of bias or partiality. *Liteky*, 510 U.S. at 556.

Thus, recusal is required "[o]nly in the rarest circumstances" when a judge displays a "deep-seated favoritism or antagonism." *Id*. at 555. The Supreme Court identified one such example: a judge in a World War I espionage case against German–American defendants said, "'One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans' because their 'hearts are reeking with disloyalty.'" *Id.* (quoting *Berger v. United States*, 255 U.S. 22, 28 (1921) (alteration in original)).

Because Perez does not allege that the judge's bias was based on events outside the sentencing proceedings, we consider whether the judge displayed a deep-seated antagonism

or favoritism that would make fair judgment—here, imposing a fair sentence—impossible. *See, e.g.*, *City of Milwaukee*, 788 F.3d at 720. The crux of Perez's allegation of bias seems to be that the judge did not impose a sentence based solely on information contained in the PSR. Before addressing Perez's argument directly, we briefly recount some of the demands a judge must navigate when sentencing a defendant, which aid us in our ultimate resolution of Perez's allegation.

Our sentencing regime is not a strict charge-offense system, in which the degree of punishment depends only upon the elements of the crime charged. *See United States v. Alldredge*, 551 F.3d 645, 647 (7th Cir. 2008). Instead, the charged offense is the starting point for determining the base offense level, and specific circumstances of the case adjust that level. To adjust the base level, the sentencing judge is tasked with looking at a variety of factors, including the behavior underlying the crime, the characteristics of the defendant, and the scope and nature of the defendant's offense. *See* 18 U.S.C. § 3553(a); U.S.S.G. § 1B1.3

This inquiry is necessarily broad in scope, and Congress made clear that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. The Sentencing Guidelines likewise provide that a judge has broad authority to consider any information about a defendant unless specifically prevented from doing so by law. *See* U.S.S.G. § 1B1.4.

Relevant here, a sentencing judge is responsible under the Guidelines for determining a defendant's relevant drug conduct—uncharged drug-related conduct for which he can

be held accountable—and the defendant's guidelines range. We've said that a "goal of including relevant conduct in sentencing is to allow a court to reflect in its sentence the actual seriousness of an offense, instead of strictly limiting it" to the charged offense. *United States v. Ritsema*, 31 F.3d 559, 564–65 (7th Cir. 1994).

To that end, the Guidelines allow a judge to consider a broad range of conduct related to drug offenses, often because a defendant's guidelines range depends substantially on the quantity charged in the indictment. *See* U.S.S.G. § 1B1.3, cmt. background ("[I]n a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction.").

The information a judge uses in sentencing will often come from a defendant's PSR. But under 18 U.S.C. § 3661, the PSR need not be the sole source of that information. Whatever the source of the information, a defendant has a due process right to be sentenced on the basis of reliable evidence, and the district judge must limit material he or she considers in calculating a sentence to that which has "sufficient indicia of reliability." *United States v. Taylor*, 72 F.3d 533, 543 (7th Cir. 1995), *abrogated on other grounds by United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015).

*1. Continuance and Order for Additional Briefing*

With that background in mind, we now turn to Perez's first argument. Because the judge did not impose a sentence based on information in the PSR, Perez believes the judge traded his judicial role for an adversarial one and turned the

government into a gatherer of evidence to support a more punitive sentence. This, Perez contends, would lead a reasonable, disinterested observer of the sentencing proceedings to conclude that fair judgment was impossible because the judge was biased and predisposed to impose a higher sentence. *See City of Milwaukee*, 788 F.3d at 720. We disagree.

The judge was faced with an "extended course of substantial drug dealing" described in the PSR. This included evidence that Perez had access to and a willingness to sell large quantities of meth. Large sums of cash, money counters, his passport, and DEA seizure notices were also linked to Perez. But that extended course of drug dealing was not reflected in the guidelines range contained in Perez's PSR.[2] As we discussed above, the judge is tasked under the Guidelines with peering beyond the quantity of drugs charged in Perez's offense to determine whether he engaged in conduct similar to his charged offense: distribution of heroin.

We view the judge's colloquy and order for additional briefing from the government as essential to carrying out his duty to determine Perez's actual conduct. The judge was not limited under § 3661 to considering only that information presented by the PSR, and the judge was well within his authority to instruct the government to present him with information about Perez's conduct in order to assess Perez's

---

[2] The judge also expressed concern about disparities between sentences of similar offenders. The judge remarked that the disparity between the guidelines range calculated in Perez's PSR and the sentences of "dozens of other defendants that I have sentenced is just shocking to me." The court also referenced two of Perez's alleged customers, who were sentenced to four years and ten years, respectively, wondering why "the guideline is less for the source than it is for the customer?"

relevant conduct under the Guidelines. *See* 18 U.S.C. § 3661. What is more, ordering additional briefing is hardly out of the ordinary. Indeed, the judge's request that the government file an additional memorandum falls well within his authority to manage the sentencing proceedings and to exercise his judgment under 18 U.S.C. § 3553(a). Instead of demonstrating deep-seated favoritism or antagonism, *Liteky*, 510 U.S. at 555, the judge demonstrated a commitment to carrying out his responsibilities to determine relevant conduct under the Guidelines and exercise judgment under § 3553(a).

The judge also carried out his obligation to ensure that additional information presented by the government would be limited to reliable information. *See Taylor*, 72 F.3d at 543. After all, "it is the judge's role to fashion a sentence based on information with a sufficient indicia of reliability." *United States v. Modjewski*, 783 F.3d 645, 650 (7th Cir. 2015) (per curiam). Consistent with this due-process requirement, the judge instructed the government that, "if you have concerns that you don't trust some of the witnesses that you might have or the informants, then you ought to tell me that and then I won't rely on it."

Nor does the judge's comment that he would be "comfortable departing or varying on the basis of other indicators of Mr. Perez's culpability, which at the moment seems quite compelling to me" demonstrate that fair judgment was impossible. The judge expressed this opinion because of facts described within the PSR. *See Liteky*, 510 U.S. at 555. And the judge's conditional language—"would be comfortable" and "at the moment"—indicates the judge had not yet reached a decision on Perez's sentence and continued to keep an open

mind when reviewing additional evidence of relevant conduct presented by the government.

In sum, Perez has not demonstrated the judge's continuance and request for additional briefing prevented him from imposing a fair sentence.

*2. Continued Sentencing Hearing*

Perez next argues that the judge displayed bias by allowing witnesses adverse to Perez to testify at the continued sentencing hearing and in relying on the government's evidence to increase Perez's guidelines range. Based on this, Perez contends a fair-minded citizen would reasonably think the judge was tilting a neutral process in favor of the judge's preferred outcome—a higher sentence. We are not persuaded by this argument.

In the memorandum that the government submitted after the judge continued the sentencing hearing, the government contended that the relevant drug conduct included not only Perez's sale of 98 grams of heroin reflected in the charged offense, but also his supply of 435 grams of meth to Barrera. *See* U.S.S.G. § 1B1.3. The government also advocated using Barrera's statements, the DEA seizure notices, and the ledgers to establish the scope and nature of Perez's drug distribution. *See* 18 U.S.C. § 3353(a). Perez responded that Barrera's statements were unreliable and objected to using these statements to support additional relevant conduct other than the charged offense conduct.

The testimony at the continued hearing focused on the allegation in the PSR that Perez supplied Barrera with the meth she attempted to sell to her brother. Barrera's testimony revealed that several days before her arrest and cooperation

with police, she told her brother in a recorded conversation that Perez was the source of the pound of meth she intended to sell to her brother.

After hearing an hour of testimony from Barrera and a police officer involved in her surveillance and arrest, the judge listened to arguments from both sides. The judge actively and thoroughly interacted with the government and defense counsel. He probed both the government and defense on the weaknesses of their arguments. Perez's counsel vigorously argued that Barrera was not credible. In the end, the judge found Barrera "to be credible on the crucial aspect of her testimony, which is that the pound of methamphetamine with which she was caught came from Mr. Perez."

The judge determined a preponderance of the evidence supported a conclusion that Perez supplied the 435 grams of meth Barrera attempted to sell to her brother. Based on this relevant conduct, the judge recalculated Perez's base offense level as 32, based on his sale of 98 grams of heroin and supply of 435 grams of meth. When taking acceptance of responsibility and criminal history into account, the judge calculated a guidelines range of 97–121 months.

In exercising his responsibilities under § 3553(a) and imposing a sentence of 121 months, the judge noted that the evidence suggested Perez was deeply involved in a significant drug-dealing operation. This included the drug ledgers, his post-arrest conversation with his girlfriend, large sums of cash, a money counter, cell phones, and Perez's passport.

In making his claim of judicial bias during the continued proceedings, Perez does not specifically challenge the judge's credibility determination as to Barrera; nor does he point to

specific statements he believes to be indicative of bias. He also does not challenge the relevant-conduct determination. Indeed, although the contours of this argument are not entirely clear, Perez seems to argue that the judge abandoned his judicial role and assumed an adversarial role at the continued sentencing hearing.

We've already recognized that the continuance was not indicative of judicial bias—indeed, it indicates the judge took seriously his obligations under § 3553(a) in sentencing Perez. And we require the judge to ensure that reliable evidence was used to enhance Perez's sentence—this included Barrera's testimony. *Taylor*, 72 F.3d at 543. Instead of imposing a sentence based on Barrera's statements in the PSR, the judge elected to assess her credibility in person. This choice allowed the defense to vigorously cross-examine Barrera, to probe and expose weaknesses and inconsistencies in her testimony, and to emphasize her criminal history and drug use. Far from prejudicial, the judge's continuance allowed for adversarial testing of the evidence prior to the judge's use of that evidence to support a higher guidelines range and sentence. It also ensured that Perez was sentenced with reliable information. Perez's bare assertion that the judge showed deep-seated favoritism or antagonism towards Perez because he allowed Barrera to testify does not support his claim of judicial bias.

At the end of the day, Perez believes the judge should have rendered his sentence based on the evidence presented in the PSR because the judge had all the information he needed to impose a sentence at Perez's initial hearing. But we think the judge's continuance was laudable, not prejudicial or indicative of favoritism or bias. It ensured that Perez's sentence was not imposed haphazardly—using potentially unreliable and

uncorroborated information—without allowing Perez time to prepare a response. Allowing the government and defense additional time to respond to the judge's concerns was eminently reasonable; so too, was allowing additional testimony. We will not fault the judge's careful approach in sentencing Perez. Indeed, far from revealing that a fair sentence was impossible, the judge's actions ensured that fair judgment was made possible.

### III. CONCLUSION

In sentencing Perez, the judge did not display any degree of favoritism or antagonism, and a reasonable observer would not come away from the sentencing hearing with the impression that fair judgment was impossible. Accordingly, we AFFIRM the sentence.