In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-2615

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JESUS RAUL BELTRAN-LEON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:09-cr-00383-16 — **Rubén Castillo**, *Judge.*

ARGUED OCTOBER 26, 2020 — DECIDED AUGUST 13, 2021

Before EASTERBROOK, ROVNER, and WOOD, *Circuit Judges*.

ROVNER, *Circuit Judge*. Jesus Raul Beltran-Leon ("Beltran")
pleaded guilty to one count of conspiracy to possess with
intent to distribute controlled substances, in violation of 21
U.S.C. §§ 841(a) and 846. Although his properly calculated
guidelines range was life in prison, the court ultimately
sentenced Beltran to twenty-eight years' imprisonment. Beltran

challenges that sentence on multiple grounds. We affirm Beltran's substantially below-guidelines sentence.

**I.**

From at least 2009 until his arrest in November 2014, Beltran was a high level lieutenant in a cell of the Sinaloa Cartel, a transnational drug-trafficking organization based in Mexico. At the time, the Sinaloa Cartel was led by Joaquin Guzman Loera, also known as "El Chapo," and the cell for which Beltran worked was led by two of El Chapo's sons, Ivan and Alfredo Guzman. Beltran coordinated, brokered and facilitated the movement of large amounts of cocaine and other drugs between and within South and Central America, Mexico and the United States. He also coordinated and oversaw the collection of significant payments for drug proceeds. He pled guilty to Count I of a five-count Ninth Superseding Indictment, which charged conspiracy to possess with intent to distribute controlled substances, including cocaine, heroin, methamphetamine and marijuana.

Prior to being charged with this crime, Beltran had never been arrested much less convicted of a crime. Although his plea declaration referenced a single transaction involving forty-six kilograms of cocaine, his lawyer agreed that "it's an absurd view that Mr. Beltran Leon only engaged in one single drug transaction here or there." R. 780, at 212–13. Counsel agreed that Beltran was involved with the movement of hundreds of kilograms of controlled substances in a "number of transactions" with the sons of El Chapo over a period of years. R. 780, at 213. Under the guidelines, this placed him in Criminal History Category I. For the purposes of sentencing, the

government proposed that Beltran was responsible for more than 450 kilograms of cocaine and ten kilograms of heroin, and the probation office and the court concurred with that assessment. That resulted in a base offense level of 38.

The probation officer and/or the government recommended a number of sentencing enhancements including: (1) a two-level increase because the offense involved the use of a dangerous weapon, under USSG § 2D1.1(b)(1); (2) a two-level increase because Beltran used violence, made a credible threat of violence, or directed the use of violence, under USSG § 2D1.1(b)(2); (3) a two-level enhancement for the use of bribery or attempted bribery of law enforcement personnel to facilitate the crime, under USSG § 2D1.1(b)(11); (4) a two-level enhancement for committing the offense as part of a pattern of criminal conduct engaged in as a livelihood, under USSG § 2D1.1(b)(16)(C), (D), and (E), and § 2D1.1 comment 20(B) and (C), and § 4B1.3; (5) a two-level increase for maintaining a premises (a stash house) for the purposes of manufacturing or distributing a controlled substance, under USSG § 2D1.1(b)(12) and USSG § 2D1.1 comment 17; (6) a four-level increase for being an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive, under USSG § 3B.1.1(a); and (7) a two-level enhancement for obstruction of justice, under USSG § 3C1.1. After hearing testimony from witnesses presented by the government and considering other evidence and the arguments of counsel, the district court applied the enhancements for use of a firearm, bribery, criminal livelihood, and leader or organizer of criminal activity; the court rejected the enhancements for the use of violence; maintaining a stash house, and obstruction of justice.

This added up to an adjusted offense level of 48, from which
the court subtracted three levels for acceptance of responsibil-
ity, for a total of 45. Under Chapter 5, Part A, Application Note
2 of the guidelines, an offense level of more than 43 is to be
treated as an offense level of 43.[1] Combined with Criminal
History Category I, the advisory guidelines "range" was a
single point: life imprisonment. The government requested a
sentence of no less than thirty-five years in light of Beltran's
"extraordinarily serious conduct, his history and characteris-
tics, and to avoid sentencing disparities." R. 714, at 18.

Beltran, in turn, argued for the mandatory minimum
sentence of ten years. Beltran's principal argument in mitiga-
tion was a claim that the Mexican authorities who effected his
arrest tortured him before turning him over to the United

---

[1] There is some confusion in both the sentencing transcript and the briefs
regarding how the court arrived at this level but everyone agrees that the
final guidelines calculation placed Beltran at level 43. The PSR calculated
the guidelines level at 52 by starting with a base of 38, and applying
enhancements for use of a dangerous weapon (+2), use of violence (+2),
bribery (+2), criminal livelihood (+2), organizer/leader (+4), and obstruction
(+2). The PSR recommended against the stash house increase, and 38 + 14
resulted in level 52 before considering a reduction for acceptance of
responsibility. Our review of the transcript reveals that, after accepting
enhancements for use of a dangerous weapon, bribery, criminal livelihood
and organizer/leader, the resulting level should have been 48, but when the
court asked the parties what level applied, government counsel replied, "I
believe his total offense level is 46, minus the three for acceptance is a
level—," and the court added, "43." In fact, his offense level was 48, minus
3 levels for acceptance of responsibility, for a total offense level of 45. This
error makes no difference to the appeal, however, because the guidelines
cap out at level 43 and so Beltran would have been sentenced at level 43
either way.

States. This torture, Beltran contended, affected the analysis of the section 3553(a) factors. For example, Beltran argued that a long sentence was not necessary for general deterrence because the fact that he was tortured by members of the Mexican government who worked in close proximity with U.S. law enforcement would deter others. Similarly, for specific deterrence, Beltran argued that the level of brutality he experienced in his first arrest was a life-changing event that was likely to deter him from any criminal conduct in the future without regard to the length of his sentence. Beltran made similar arguments for the remaining section 3553(a) factors, essentially arguing that the torture he suffered at the hands of Mexican authorities overrode any of the usual concerns addressed by the section 3553(a) factors. He also argued that the torture was itself punishment for which he should receive some sentencing credit.

The court entertained argument from both sides on Beltran's primary claim in mitigation. As we will detail below, the proceedings became contentious when defense counsel suggested that U.S. law enforcement officers had somehow participated in or sanctioned the torture, and when counsel implied that the government's lawyers had failed to turn over evidence related to the torture. At two points in the hearing, the judge referenced an article that had not been disclosed to the parties. According to the judge, the article established that Mexican law enforcement suffered hundreds of deaths at the hands of drug cartels, and the judge suggested that the aggression of Mexican law enforcement was a response to this loss of life. The judge, who noted that he is of Mexican descent, also expressed "personal hurt" over the violence that drug

cartels have caused in Mexico. The court nevertheless significantly discounted Beltran's sentence from the guidelines range of life (and even from the minimum of thirty-five years requested by the government) in recognition of the "severe mistreatment" that Beltran experienced, setting a final sentence of twenty-eight years. Beltran appeals.

## II.

Beltran challenges the sentence on the grounds that the district judge: (1) violated his due process rights when the judge considered his own ethnicity in setting Beltran's sentence; (2) improperly considered irrelevant, extra-record evidence in determining his sentence; (3) failed to explain adequately the basis for the sentence; (4) improperly drew a negative inference from Beltran's failure to testify at sentencing, in violation of his Fifth Amendment rights; and (5) improperly failed to recuse from the sentencing proceeding under the Federal Recusal Statute, 28 U.S.C. § 455. We review constitutional challenges to a sentence *de novo*. *United States v. Fletcher*, 763 F.3d 711, 715 (7th Cir. 2014); *United States v. Brucker*, 646 F.3d 1012, 1016 (7th Cir. 2011). Our review of sentencing decisions generally is limited to whether they are reasonable, applying the abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 46 (2007); *United States v. McLaughlin*, 760 F.3d 699, 703 (7th Cir. 2014). We first must ensure that the district court committed no significant procedural error, including, among other things, "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explana-

tion for any deviation from the Guidelines range." *Gall*, 552 U.S. at 51. Whether the district court committed procedural error is a question of law that we review *de novo*. *United States v. Griffith*, 913 F.3d 683, 687 (7th Cir. 2019). We review the district court's findings of fact for clear error. *United States v. Knox*, 624 F.3d 865, 870 (7th Cir. 2010). Sentences that are within the properly calculated guidelines range are entitled to a rebuttable presumption of reasonableness. *Rita v. United States*, 551 U.S. 338, 347 (2007); *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). If the district court erred in sentencing Beltran, we will apply the doctrine of harmless error in determining whether resentencing is necessary. *United States v. Olson*, 450 F.3d 655, 683 (7th Cir. 2006). An error related to the validity of a defendant's sentence is harmless only if it did not affect the district court's choice of sentence. *Olson*, 450 F.3d at 683.

## A.

Beltran does not challenge the calculation of the guidelines range. He contends that the district court's selection of a sentence below the guidelines range was based on impermissible factors and that the court did not adequately explain the basis for the sentence. A court's failure to explain adequately the reasons for the sentence would constitute procedural error, *Gall*, 552 U.S. at 51, and would, in theory, hamper our efforts to review the sentence so we will start with the court's explanation for setting the sentence at twenty-eight years, which is a

substantial discount from the guidelines range of life.[2] In general, "[t]he sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Rita*, 551 U.S. at 356. When a judge decides to apply a within-guidelines sentence, "doing so will not necessarily require lengthy explanation." *Id*. In this case, the court applied a below guidelines sentence:

> Where the defendant or prosecutor presents nonfrivolous reasons for imposing a different sentence, however, the judge will normally go further and explain why he has rejected those arguments. Sometimes the circumstances will call for a brief explanation; sometimes they will call for a lengthier explana-

---

[2] To gauge the generosity of the discount, we note that Beltran was a month shy of his thirty-first birthday when he was first detained in 2014, and the court credited all the time that he was in custody when setting his sentence. A sentence of twenty-eight years would result in release at age fifty-nine at the latest, with the possibility that Beltran could shave several years off that release date by behaving satisfactorily in prison, a situation entirely within his own control. *See* 18 U.S.C. § 3624(b) (providing for credit of up to fifty-four days per year for prisoners who display exemplary compliance with institutional regulations). Life, on the other hand, for a man who enters custody at the age of approximately thirty-one, is potentially a substantially longer term. The Social Security Administration provides a life expectancy calculator which projects that a man born on Beltran's date of birth will live to age 81.7. *See* https://www.ssa.gov/cgi-bin/longevity.cgi (last visited August 6, 2021). A sentence of twenty-eight years would result in a discount of more than twenty-two years off of a life sentence, and provide a meaningful opportunity to live (and die) outside of prison.

tion. Where the judge imposes a sentence outside the Guidelines, the judge will explain why he has done so.

*Rita*, 551 U.S. at 357. *See also United States v. Stephens*, 986 F.3d 1004, 1010 (7th Cir. 2021) (at a sentencing, the judge must correctly calculate the range, address the parties' principal arguments, consider the statutory factors, and explain the sentence; but the court need not march through every factor under § 3553(a) in a checklist manner; only an adequate statement of the applicable factors is needed). Section 3553(a) provides the factors that judges should consider in imposing a sentence sufficient, but not greater than necessary, to comply with the purposes of the statute: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed: to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; and (4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, among other things. 18 U.S.C. § 3553(a).

The court spent nearly two full days conducting the sentencing proceedings and considering Beltran's principal argument in mitigation, namely, his claim that the torture he suffered at the hands of the Mexican military affected the application of the section 3553(a) factors, and that "the experi-

ence of torture will make every day of Mr. Beltran Leon's confinement far more difficult and painful than it would be for another inmate." R. 704, at 12. In explaining the reasons for the sentence, the court noted that Beltran lacked proof regarding the degree of his mistreatment, relying primarily on his own affidavit, which the court did not entirely credit because of inconsistencies. R. 780, at 269, 285–86, 293. The court nevertheless agreed that Beltran was "mishandled and treated inappropriately," and had produced evidence of "severe mistreatment." R. 780, at 264, 286.

In addressing the section 3553(a) factors, defense counsel argued that the torture that Beltran experienced significantly reduced his chance of recidivism, maintaining that because of that experience Beltran did not want to have anything to do with criminal activity again, and would not want to put his family through the experience again either. The court disagreed, citing undercover recordings of Beltran in prison that the government placed into evidence during the sentencing hearing:

> I didn't use the obstruction enhancement, but he certainly doesn't come across like that in the recordings that we heard yesterday. That's all I will tell you. It doesn't sound like the person you're describing right now, Mr. Brindley, so I just have to call you on that.

R. 780, at 276. The court thus rejected the idea that the mistreatment that Beltran suffered at the hands of Mexican officials significantly affected his risk of recidivism. Counsel also argued that the torture affected Beltran's level of trust

with the government and influenced his decision not to cooperate. The court rejected this argument as the basis for any reduction in the sentence, finding that the court needed to send a message that, "if you're going to be involved in this type of drug dealing at this level and you decide not to cooperate, then you will serve a significant sentence in the United States if you're successfully prosecuted[.]" R. 780, at 287–88. The court further noted that "there is a premium on cooperating because you do put your life at risk in cooperating." R. 780, at 288. The court thus considered the claim that torture affected Beltran's decision not to cooperate but declined to give it any effect due to concerns about general deterrence in a case of this magnitude and the need to encourage cooperation in the future.

The court further explained the sentence by remarking that Beltran was a "very, very significant drug dealer and probably one of the most significant drug dealers I have sentenced, and we—there's a price to be paid for being involved in a drug conspiracy as large as this was ultimately headed by Mr. Guzman who was tried in New York." R. 780, at 284. That conduct evinced a great need for general deterrence because of the magnitude of Beltran's crime, which included high level involvement with a large conspiracy run by a notorious drug cartel. The court thus considered and rejected Beltran's claim that public knowledge of the torture would adequately address general deterrence regardless of the length of Beltran's sentence. *See* R. 704, at 13.

Beltran's counsel further posited that the torture served as part of the punishment for the crime that was "worth something," and it was up to the judge to decide how much. In

written pleadings for the sentencing, Beltran also contended that the torture would affect Beltran's daily experience in prison, causing increased fear and anxiety regarding his possible treatment by government officials. He also argued that giving Beltran some allowance for the torture would promote respect for the law, accounting essentially for the lawlessness of the officials who tortured him. Here, too, the court considered Beltran's arguments and did in fact account for his mistreatment at the hands of Mexican law enforcement officials.

To place the court's explanation of the sentence in context, we include the bulk of the court's concluding remarks here:

> So you decided to involve yourself in [the conspiracy], and, yes, today you do make a statement which I want to rely on in terms of how much you have reformed, but I am unsure as to how much you really, really have reformed. I cannot calculate that. What I do know is that you were a serious drug conspirator at a high level, and I need to sentence you accordingly.
>
> The elephant in the room is this allegation of torture by Mexican Marines, and it is hard for me to get a handle on that because there's no clear proof. There certainly is no proof of any kind that the DEA was involved or anybody from the United States. There's a suspicion, but as I said before, our—we don't operate

our legal system here in the United States based on suspicion.

If that were the case, I'd be sentencing you a lot higher because there's a strong suspicion that you were trying to do something to one of the witnesses in this case, but we cannot rely on suspicion. We are a country of laws. And … we cannot have a situation where the end justifies the means in the administration of criminal law.

So ultimately the United States does not sanction torture of any kind in any country, and that is the United States that I'm proud to serve as a United States District Court Judge.

Did the Mexican Marines torture Mr. Beltran Leon? It will take a power greater than me to come to the bottom line of that, but I do submit that he has put forth some evidence indicating severe mistreatment, and I do think that part of the reason for that is what I waved around before is that they, meaning the Mexican military personnel, because at the end of the day, the Assistant United States Attorneys and I are not the ones busting through doors in Mexico arresting people who are heavily armed. They, Mexican military personnel, have to undertake that service.

They've lost considerable personnel in Mexico. … 750 military personnel dead. I'd like to know the number of family members of military personnel who have been killed, because that would be a sad story, let alone if we go to media who have been killed in Mexico. That's a whole 'nother story.

So nothing good has come out of the cartels that have existed in Mexico, and that's sad to me because for all of my almost 65 years, Mexican blood has run through my veins, and so this is a personal hurt that I feel every day. So I repeat, Mexico is tired of this violence, and so is the United States.

So at the end of the day, I do agree with Mr. Brindley that Mr. Beltran Leon's sentence should be somewhat modified downward because of what may have occurred because the end doesn't justify the means. So at the end of the day, I believe the sentence that is appropriate for Mr. Beltran Leon, because of his involvement in this significant drug conspiracy that breeds nothing but harm to this country because I will tell you every day I see that, in my work with former federal prisoners who are addicted to cocaine and heroin, mostly minority men and women, it is a sad day, I'm going to sentence Mr. Beltran Leon to 28 years in the custody of the Attorney General. That is what I believe is a

sufficient-but-no-greater-than-necessary sentence, a sentence of 336 months in custody.

And I believe a message should go out that if you're going to be involved in this type of drug dealing at this level and you decide not to cooperate, then you will serve a significant sentence in the United States if you're successfully prosecuted, and that is the message that I think my fellow judges have been sending out. It is a different situation if you cooperate, and there is a premium on cooperating because you do put your life at risk in cooperating, and I don't minimize for one second that Mr. Perez is at risk, our first witness in this sentencing proceeding, by giving the testimony he has given. That's just a fact of life. And I think any judge worth his or her salt will take into consideration cooperation each and every time.

R. 780, at 285–88.

This discussion, in combination with other remarks we have cited, supplies a more than adequate explanation for why the court imposed the substantially below-guidelines sentence that it did. Although Beltran objects to some of the court's comments, it is plain that the court considered the section 3553(a) factors and either accepted or rejected the arguments of both parties based on the facts and the law. We will consider separately whether the sentence was also influenced by

impermissible factors, but the court's explanation provides a sufficient basis for our review of the sentence.

**B.**

We turn to Beltran's specific objections, beginning with his claim that the district judge violated his due process rights by considering ethnicity in setting Beltran's sentence. Specifically, in assessing Beltran's claim that he had been tortured by the Mexican military, the judge remarked on the loss of military personnel in Mexico who had been killed by members of drug cartels and noted his Mexican heritage and his own sense of "personal hurt," as we quoted above. *See* R. 780, at 287. Under the guidelines, national origin is not relevant to the determination of a sentence. USSG § 5H1.10. *See also Zant v. Stephens*, 462 U.S. 862, 885 (1983) (describing as "constitutionally impermissible or totally irrelevant to the sentencing process" factors such as the race, religion, or political affiliation of the defendant); *Franklin v. McCaughtry*, 398 F.3d 955, 959 (7th Cir. 2005) (noting that the due process clause guarantees litigants an impartial judge).

Nevertheless, in the context of a two-day hearing that covers two hundred and ninety-four pages of transcript, it is apparent that the judge did not use his own or the defendant's ethnicity in determining the substantially-below guidelines sentence. When it is clear that the judge's reference to his own ethnicity did not affect the selection of the sentence, there is no due process violation. *See e.g., United States v. Traxler*, 477 F.3d 1243, 1249 (10th Cir. 2007) (noting that due process analysis of a judge's bias extends only to those circumstances where impermissible personal views expressed at sentencing were the

basis of the sentence, and collecting cases). As we discussed above, the court fully explained the reasons for its choice of the sentence, and those reasons are well-founded in the law (including the section 3553(a) factors) and well-supported by the record, including the judge's decision to sentence Beltran below the guidelines range based on his principal argument in mitigation. The court systematically considered the appropriate sentencing factors along with the evidence provided, and issued several rulings in Beltran's favor. The court credited Beltran's primary argument in mitigation, taking exception only to the proof of the degree of mistreatment, and settled on a substantially below-guidelines sentence for a very serious crime. Because neither ethnicity nor personal bias factored into the determination of the sentence, there was no error of a constitutional dimension, and there is no need to remand for resentencing.

## C.

Two of Beltran's other objections arise from the same part of the sentencing hearing and so we will address them together. First, Beltran objects to the court's apparent use of extra-record material in setting the sentence. Second, he asserts that the district court improperly drew a negative inference from his failure to testify at sentencing, in violation of his Fifth Amendment rights. In the second day of the sentencing proceedings, the judge took issue with one of Beltran's lawyers after counsel said that his client's claims of torture were credible and "[i]f there's any issue of credibility, it has to be on that table right there. They're the ones that have been hiding this information for a long time." R. 780, at 256. Counsel followed this with an accusation that the DEA was "right in the

middle of all these tortures, and they're saying we don't know anything about it. That's incredible." R. 780, at 257. The court noted that defense counsel had pointed to the government's table when making this accusation, and remarked that the court had seen no evidence of government counsel hiding information. Nor had the court been presented with any evidence that the DEA was "in the middle of torture in Mexico." The court warned counsel of "needlessly, needlessly expending your credibility with this Court." R. 780, at 256–57. The court then asked counsel for proof of the claim that the DEA was in the middle of the torture in Mexico, and counsel conceded he had none. The court said:

> You don't have one witness other than your client , who doesn't take the witness stand and he's free to take the witness stand. Let him take the witness stand right now and see how that goes for him.

R. 780, at 258. Counsel replied that Beltran had filed an affidavit regarding the torture. The court then asked four times whether Beltran would take the witness stand and repeat the affidavit. Counsel replied that Beltran would not take the witness stand. In response, the court said:

> Okay. And there's a reason for that, and any lawyer in this business knows the reason behind that.
>
> So please don't do this. You're needlessly expending your credibility with this Court, and you're tarnishing reputations of

> prosecutors in this courtroom. For what? For
> what? You don't have proof.

R. 780, at 258. After essentially agreeing that he lacked direct proof of DEA involvement, counsel reiterated that Beltran was tortured.

The court then changed direction and asked counsel what was driving the torturing of narcotics defendants in Mexico. Counsel ventured that Mexican authorities were seeking information on other people through the use of torture. The court then responded:

> Is that all? Do you think that's all? Do you
> think that's all, sir? … How about this? Let
> me just show you this: "Mexico war on drugs
> leaves 750 military personnel dead," okay?

R. 780, at 260. The item that the court showed counsel, that the court "waved around," was apparently an article that the court had not supplied to either the defense or the government. The court then asserted that the Mexican military engaged in torture because they themselves had been tortured and 750 military personnel had been murdered in the war on drugs. "Violence begets violence," the court said. R. 780, at 261. The court acknowledged that the ends did not justify the means, that it was not right for this to occur, and that it should not have happened. But the court also insisted that counsel acknowledge that any torture was due, at least in part, to the loss of life by military personnel, and counsel eventually conceded the point. When counsel described the torture that Beltran claimed to have suffered, which included both near drowning and suffocation with plastic bags among other

horrific allegations, the court agreed that, if such things happened, that was "definitely inappropriate," but that "there's no conclusive evidence that that happened." R. 780, at 264–65.

Beltran objects that the court wrongly relied on extra-record material in setting the sentence when it cited an article regarding the deaths of Mexican military personnel as a possible motive or justification for the torture of drug suspects. A defendant has a due process right to be sentenced only on the basis of reliable information. *United States v. Adams*, 879 F.3d 826, 829 (7th Cir. 2018). A "court is generally prohibited from relying on undisclosed evidence as this deprives the parties of the opportunity to rebut or respond to the evidence." *United States v. Betts*, 576 F.3d 738, 744 (7th Cir. 2009). A court should therefore not rely on an undisclosed article. Moreover, the matters the court discussed based on this article, including the number of military personnel killed in the war on drugs, and possible motives for the military to engage in torture of narcotics suspects, are not matters for judicial notice. *Tobey v. Chibucos*, 890 F.3d 634, 647–48 (7th Cir. 2018) (a court may judicially notice only a fact that is not subject to reasonable dispute).

The government contends that Beltran did not preserve this objection because counsel did not object to this material during the sentencing hearing and largely agreed that the substance of the article was correct, that is, that hundreds of Mexican military personnel have been killed in the war on drugs, and that the torture of drug suspects was occurring in reaction to those deaths. R. 780, at 262 (where defense counsel states, "I agree with you. I agree with you … I would say there's

hundreds[.]"). Beltran asserts that this is not a fair reading of the record and points to earlier parts of the transcript where counsel would only say that he "suspect[ed]" Mexican Marines had died in the war on drugs. Beltran also asserts that the "court was clearly angered at what it perceived to be defense counsel's lack of empathy" for Mexican law enforcement agents. Reply Brief, at 6. In the end, our review of the record shows that counsel never objected to the court's references to the article and ultimately agreed with the substance of the court's statements, as we noted above. Counsel instead disputed the significance of this information, and the court then agreed with counsel that, although these law enforcement deaths might explain why torture was occurring, it did not justify the torture in any way.

Beltran forfeited his objection to the court's use of this article by not raising it below. His suggestion that counsel did not object because the court was angry at counsel's lack of empathy does not change the analysis. *See Puckett v. United States*, 556 U.S. 129, 134 (2009) ("If a litigant believes that an error has occurred (to his detriment) during a federal judicial proceeding, he must object in order to preserve the issue. If he fails to do so in a timely manner, his claim for relief from the error is forfeited."); *United States v. Hathaway*, 882 F.3d 638, 640 (7th Cir. 2018) (a criminal defendant hoping to preserve an issue for appeal must make a timely and specific objection in the district court). "[T]he contemporaneous-objection rule prevents a litigant from sandbagging the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor." *Puckett*, 556 U.S. at 134 (internal quotation marks omitted). Raising a timely

objection would have allowed the court to fix any error, and perhaps clarify to what use it was putting this undisclosed article. We review a forfeited claim for plain error only. Beltran does not meet the plain error standard here.

In the context of the entire record, it is apparent that the court did not use this extraneous material in setting the sentence, and certainly did not use it to Beltran's detriment. If anything, the court's references to the article supported the court's factual finding that Beltran had been mistreated by the Mexican military because the article supplied a credible motive for torture that supported Beltran's less than fully credible story. The court ultimately agreed that, despite holes in Beltran's affidavit and a lack of corroborating evidence on the issue of torture, Beltran was severely mistreated, and that it was wrong for this to occur. On the basis of that finding in Beltran's favor, the court discounted his sentence significantly. Again, we can say with confidence after reviewing the record as a whole that this article did not adversely affect the selection of the sentence.

As for Beltran's claim that the court improperly drew a negative inference from his failure to testify at sentencing in violation of his Fifth Amendment rights, after the court pronounced the sentence, the government asked the court to clarify those remarks. The court explained:

> I have not held that against the defendant, but I just wanted to clarify that he put forth an affidavit, and there were some holes in that affidavit the way I saw it in terms of who did what, and there was just no opportunity

> to buttress that in any sense, but I understand
> he has a right not to testify.

R. 780, at 293. Beltran contends that the court's explanatory comments came too late and were insufficient to overcome the court's remarks regarding Beltran's failure to testify, especially in light of the court's comment that "there's a reason for that, and any lawyer in this business knows the reason behind that." We disagree. The court explained that its earlier comments reflected only that the affidavit was insufficient by itself and that Beltran presented no other evidence to explain the inconsistencies or corroborate his assertions. In any case, the court ultimately did in fact credit Beltran's claim of mistreatment, noting only that Beltran had failed to provide credible evidence of mistreatment rising to the level of torture. The court significantly discounted Beltran's sentence based on this claim, setting a sentence twenty percent lower than the government's request for a sentence of at least thirty-five years.

### D.

Beltran finally asserts that the district judge should have recused from the sentencing proceedings under 28 U.S.C. § 455(a). Section 455(a) provides:

> Any justice, judge, or magistrate judge of the
> United States shall disqualify himself in any
> proceeding in which his impartiality might
> reasonably be questioned.

According to Beltran, the district judge's bias was apparent in his remarks about: personal hurt, the Mexican blood that runs through his veins, Beltran's claims of torture and the

reasons behind it, and the repeated references to the number of Mexican military personnel and others killed by drug cartels. Beltran did not move for recusal under section 455(a) in the district court. We review challenges raised for the first time on appeal for plain error. Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."); *United States v. Perez*, 956 F.3d 970, 974 (7th Cir. 2020). Beltran asserts that we should review his claim *de novo* because he had no opportunity to object in the district court. He claims that the court's bias did not reveal itself until moments before the sentence was imposed, and that litigants should not be "required to interrupt a court mid-ruling and demand the court consider recusing itself." Reply Brief at 11–12. By Beltran's broad description of his claim, it is clear that many of the comments reflecting the purported bias came well before the sentence was imposed. And it should go without saying that lawyers who wish to preserve an issue for review are in fact expected to lodge their objection as soon as something problematic happens, even if it means interrupting a judge mid-ruling. We speak from broad experience when we say that the defense bar in the Northern District of Illinois is not composed of shrinking violets who fear offending or interrupting judges. Such reluctance cannot be an acceptable excuse for failing to lodge an objection; it is not a workable standard. Because a great deal of the purportedly biased language came well before the end of the proceedings, counsel had opportunities to object and so we will review for plain error only.

When a defendant raises an objection for the first time on appeal, we ask whether the defendant has shown that the error was obvious, affects substantial rights, and seriously affects the fairness, integrity, or public reputation of the proceedings. *United States v. Olano*, 507 U.S. 725, 732 (1993). To determine whether a judge's violation of section 455(a) affects substantial rights, we look to the three factors outlined in *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864 (1988). *See also Perez*, 956 F.3d at 974–75; and *United States v. Atwood*, 941 F.3d 883, 885 (7th Cir 2019). Those factors are: (1) the risk of injustice to the parties in this case, (2) the risk of injustice to parties in future cases, and (3) the risk of undermining public confidence in the judicial process. *Atwood*, 941 F.3d at 885.

Beltran does not meet the standard for plain error here, largely for the reasons we set forth above. In particular, he is unable to demonstrate that any improper factors affected the court's selection of the substantially below-guidelines sentence here. The section 455(a) standard is rigorous:

> Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. … *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and

> even anger, that are within the bounds of
> what imperfect men and women, even after
> having been confirmed as federal judges,
> sometimes display.

*Liteky v. United States*, 510 U.S. 540, 555–56 (1994). This was not a case where fair judgment was impossible. Indeed, impossibility of a fair judgment would be a most curious claim when advanced by a defendant who has dodged a life sentence by a very wide margin. "Rule 52(b) leaves the decision to correct the forfeited error within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " *Olano*, 507 U.S. at 732 (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)). We will not exercise our discretion to find plain error here.

### III.

Our review of the entire proceeding gives us complete confidence that none of the discussed factors affected the selection of Beltran's sentence.

AFFIRMED.